**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JONNIE D. MILLER, an individual;
STEVEN D. MILLER, an individual;
CMG WORLDWIDE INC., a
corporation,
　　　　　*Plaintiffs-Appellants,*

　　　　　　v.

GLENN MILLER PRODUCTIONS, INC.,
a corporation,
　　　　　*Defendant-Appellee.*

No. 04-55874

D.C. No.
CV-03-00529-AHM

JONNIE D. MILLER, an individual;
STEVEN D. MILLER, an individual;
CMG WORLDWIDE INC., a
corporation,
　　　　　*Plaintiffs-Appellees,*

　　　　　　v.

GLENN MILLER PRODUCTIONS, INC.,
a corporation,
　　　　　*Defendant-Appellant.*

No. 04-55994

D.C. No.
CV-03-00529-AHM

OPINION

Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
December 7, 2005—Pasadena, California

Filed July 19, 2006

7947

Before: Robert R. Beezer, Cynthia Holcomb Hall, and
Kim McLane Wardlaw, Circuit Judges.

Per Curiam Opinion

## COUNSEL

Brian G. Wolf and Paul Karl Lukacs, Lavely & Singer, P.C., Los Angeles, California, for the plaintiffs-appellants-cross-appellees.

Sheldon Eisenberg, Adam J. Thurston, and Melissa B. Bonfiglio, Bryan Cave LLP, Santa Monica, California, for the defendant-appellee-cross-appellant.

---

## OPINION

PER CURIAM:

**[1]** Steven and Jonnie Miller, adopted children of Helen Miller, wife of the world-renowned bandleader Glenn Miller, and their exclusive licensing agent CMG Worldwide Inc. (collectively "Appellants") appeal from the district court's order granting defendant Glenn Miller Productions, Inc. ("GMP") summary judgment and dismissing their complaint on the basis of laches. *See Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923 (C.D. Cal. 2004). GMP cross-appeals the district court's determination that it is engaged in unauthorized sublicensing. In his well-reasoned opinion, District Judge A. Howard Matz ruled that a licensee of trademark and related publicity rights may not sublicense those rights to third parties without express permission from the original licensor. *Id.* at 939. We agree with this extension of the well-established "sublicensing rule" from copyright and patent law to the licensing of trademark and related publicity rights such as occurred here, and with the district court's reasons for extending the rule. The district court also correctly ruled, however, that Appellants are barred by the doctrine of laches from taking legal action now, based on undisputed evidence establishing that they should have known of GMP's allegedly infringing activities well beyond the statutory period for bringing suit. *Id.* at 944-45. Accordingly, we affirm and adopt the district court's thorough opinion with the exception of Section C.5 (*id.* at 945-46) and the final three sentences of the opinion (*id.* at 946, beginning with "Alternatively, the Court rules"). We also reprint the incorporated portions as an appendix to this opinion.

We nevertheless address GMP's argument that the district court erred in concluding that it sublicensed the "Glenn Miller" mark rather than that it licensed its own separate and independently owned "Glenn Miller Orchestra" mark. A party that prevails on summary judgment may cross-appeal "any adverse finding that form[s] the basis for collateral estoppel in subsequent litigation." *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1345 (9th Cir. 1984) (alteration in original) (internal quotation marks omitted).

**[2]** We reject GMP's contention that because it registered the "Glenn Miller Orchestra" mark and the mark has become incontestable, it has rights to the mark independent of the rights to the "Glenn Miller" mark licensed by Helen Miller in the 1956 agreement. This argument misapprehends a fundamental principle of trademark law: Registration does not create a mark or confer ownership; only use in the marketplace can establish a mark. *See Cal. Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1454 (9th Cir. 1985) ("[A] trademark is a common law property right that exists independently of statutory provisions for registration." (internal quotation marks omitted)); 3 McCarthy on Trademarks and Unfair Competition § 19:3, at 19-15 to -16 (4th ed. 2005). Neither the registration nor the incontestable status of the "Glenn Miller Orchestra" mark affects Appellants' ownership of the "Glenn Miller" mark, which (a jury could find) was acquired through use in the marketplace.[1] *See* 15 U.S.C.

----

[1]We reject GMP's argument that the district court erred in considering Glenn Miller promotional materials and cease-and-desist letters from Appellants to suspected trademark infringers, submitted to the district court with Appellants' reply to GMP's opposition to their motion for summary adjudication, in determining that the evidence was sufficient for a jury to conclude that Helen Miller owned a "Glenn Miller" trademark in 1956. Appellants introduced the evidence to counter GMP's claims in its opposition to summary adjudication that they had not established the existence of a "Glenn Miller" mark and had not policed their trademark rights. Had GMP desired to respond to the new material, it could have asked the district court for permission to do so. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996), *as amended*.

§ 1065 (providing that a registered mark is not incontestable "to the extent, if any, to which the use of [the] mark . . . infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration under this chapter of such registered mark"). GMP's "Glenn Miller Orchestra" mark does not foreclose Appellants from establishing that GMP breached the 1956 agreement and infringed upon their rights to the "Glenn Miller" mark.

GMP misplaces reliance on *Holiday Inns, Inc. v. Trump*, 617 F. Supp. 1443 (D.N.J. 1985), for the proposition that a licensee, by developing a trademark based on a name it has been licensed to use, may acquire rights in the licensed name adverse to the original licensor. In *Trump*, two hotel companies entered into a partnership with Donald Trump to develop and operate a casino hotel in Atlantic City, New Jersey. *Id.* at 1446. Trump granted the partnership a license to use his name, and the partnership named its property the "Trump Casino Hotel." *Id.* at 1453-55. When Trump subsequently opened a casino hotel named "Trump's Castle Casino Hotel" in Atlantic City, the hotel companies sued to enjoin Trump from using his name in association with the new property. *Id.* at 1446-47. The district court rejected the hotel companies' contract law claims, finding that Trump had not bargained away his right to use his name for competing facilities. *Id.* at 1462-63. It also held that the hotel companies had acquired some rights in Trump's name through the development of goodwill associated with the Trump Casino Hotel, *id.* at 1469-70, but it ultimately denied injunctive relief based on equitable considerations, *id.* at 1474. Because GMP is not seeking to enjoin Appellants from competing with its Glenn Miller Orchestra business, but rather contends that its "Glenn Miller Orchestra" mark is independent of Appellants' "Glenn Miller" mark and may be freely licensed to third parties, *Trump* is inapposite.

[3] We also reject Appellants' challenge to the district court's laches ruling. It is well-established that we examine

when a plaintiff "knew or should have known" of the infringing activity to determine whether the plaintiff unreasonably delayed in bringing suit. *E.g.*, *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002); *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1039 (9th Cir. 2000). Thus in *E-Systems, Inc. v. Monitek, Inc.*, we held that laches barred a trademark infringement action even though the plaintiff did not acquire actual knowledge of the defendant's activities until the year of suit, where the "[p]laintiff ought to have discovered defendant's use sooner had it been diligently seeking to enforce its mark." 720 F.2d 604, 607 (9th Cir. 1983), *as amended*; *see also Bridgestone/Firestone Research, Inc. v. Auto. Club de l'Ouest de la France*, 245 F.3d 1359, 1362, 1364 (Fed. Cir. 2001) (holding that a petition for cancellation of a registered trademark was barred by the doctrine of laches based on the petitioner's constructive knowledge); 5 McCarthy on Trademarks § 31:38, at 31-82 (laches requires determining when the plaintiff was "actually or constructively on notice of defendant's activities").

Undeterred, Appellants cite several cases supposedly holding that laches is applicable only where the trademark holder "knowingly allowed" the infringing mark to be used without objection for a lengthy period of time. *See Brother Records, Inc. v. Jardine*, 318 F.3d 900, 909 (9th Cir. 2003); *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1061 (9th Cir. 1999). In the asserted cases, however, constructive knowledge was not at issue; rather, we declined to apply laches because there was no undue delay between the inception of infringing activity and the filing of a lawsuit. *See Brother Records*, 318 F.3d at 902-03 (plaintiff filed suit within one year of the inception of defendant's infringing activity); *GoTo.com*, 202 F.3d at 1204 (plaintiff filed suit within two months of the inception of defendant's infringing activity); *Brookfield Commc'ns*, 174 F.3d at 1061 ("Brookfield filed suit the very day that West Coast publicly announced its intention to launch [the allegedly infringing

website].”). The phrase “knowingly allowed” in these opinions is dictum and cannot bear the weight Appellants seek to place on it.

Appellants also assert that the district court made a finding that Steven Miller had actual knowledge of GMP’s unauthorized activities several years before filing suit. While GMP is not entitled to summary judgment on the issue of laches based on Steven’s actual knowledge in light of Steven’s sworn declaration that he lacked such knowledge until 2000 or 2001, the district court did not make a finding of actual knowledge. *Cf. Leslie v. Grupo ICA*, 198 F.3d 1152, 1157-59 (9th Cir. 1999) (holding that a sworn statement by a non-movant must be accepted as true on summary judgment unless the statement contradicts other sworn statements by the non-movant). The district court’s finding of unreasonable delay rests on Appellants’ constructive knowledge.[2]

[4] The district court correctly held that Appellants may have had constructive knowledge of GMP’s activities as early as 1981, more than twenty years before the current suit was filed, and certainly no later than 1994, when Steven Miller’s attorney began receiving GMP’s financial statements, and thus that they unreasonably delayed in bringing suit. *See, e.g.*, *E-Systems*, 720 F.2d at 607 (holding that a delay of six to eight years was unreasonable). Because we affirm the district court on the basis of laches, we do not review its alternative holding that Appellants’ failure to supervise GMP’s use of the “Glenn Miller” mark estops them from bringing this suit. *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 n.** (Fed.

---

[2]Relatedly, we do not address Appellants’ claim that the district court erred in receiving into evidence a draft pleading prepared but apparently never filed by Steven’s attorney in his California state court suit against David Mackay, Sr. in 1980. The pleading is relevant only to Steven’s actual knowledge of GMP’s behavior, an issue that cannot be resolved on summary judgment.

Cir. 1998) ("Because we affirm summary judgment on the basis of laches, we do not reach equitable estoppel.").

**AFFIRMED.**

# APPENDIX

United States District Court,
C.D. California.
Jonnie MILLER, Steven Miller, and CMG Worldwide, Inc.,
Plaintiffs,
v.
GLENN MILLER PRODUCTIONS, Defendant.
**No. CV03529AHM (MCX).**

April 23, 2004.

MATZ, District Judge.

## *TABLE OF CONTENTS*

FACTUAL BACKGROUND. .........................................927
ANALYSIS. ......................................................932

A.  The Legal Standard for a Motion
    for Summary Judgment. ...........................................932
B.  Plaintiffs' Motion for Summary Adjudication:
    May GMP Sub-License Intellectual Property
    Rights Without Plaintiffs' Permission?. ....................933

    1.  Defendant's Threshold Arguments That
        the 1956 Agreement Did Not Convey a
        License. ...............................................933

        a.  The Only Reasonable Interpretation
            of the 1956 Agreement is That
            it Conveys to GMP Both a Trademark
            License and a License of Glenn Miller's
            Publicity Rights. .........................................934
        b.  The Court Rejects GMP's Arguments
            that, as a Matter of Law, the 1956
            Agreement Could Not Have Conveyed a
            Trademark License. ......................................935

2.  The Policy Reasons For the Sub-Licensing
    Rule in the Patent and Copyright Contexts
    Support Extending the Rule to the
    Trademark Context. ...........................937
3.  The Same Policies Also Support an
    Extension of the Sub-Licensing Rule to
    Licenses of Publicity Rights. ............938
4.  Estoppel. .........................................939

C.  Defendant's Motion for Summary Judgment. ..........939

1.  GMP Lacks the Unilateral Right to
    Sub-License Multiple Ensembles Using the
    Name "The Glenn Miller Orchestra". ...............939
2.  There Are Fact Issues Concerning Any
    Right of GMP to Directly Operate "Special
    Units" of the Glenn Miller Orchestra and to
    Sell Merchandise. ..............................940
3.  The Relationship Between GMP's
    Contractual Rights and the Eleven Causes of
    Action Asserted in the Complaint. ....................941
4.  Plaintiffs' Claims Are Barred By Laches. .........941

    a.  Plaintiffs' Delay in Bringing Suit. ..............942

        i.   The Operation and Sub-Licensing
             of Multiple Bands. ................................942
        ii.  The Sale of Merchandise. ....................943

    b.  Resulting Prejudice to GMP. ........................944

5.  Plaintiffs are Estopped From Enforcing the
    Terms of Any Trademark License Conveyed
    to GMP by the 1956 Agreement. .......................945

CONCLUSION. ............................................946

This matter is before the Court on Plaintiffs' Motion for Summary Adjudication and Defendant's Motion for Summary Judgment.

**FACTUAL BACKGROUND**

The principal facts of this case are either undisputed or not genuinely disputed.[FN1] Glenn Miller was a popular musician **\*927** and band leader who formed the Glenn Miller Orchestra in 1938. During the 1930s and 1940s, Glenn Miller recorded and released sound recordings using his name and the name "Glenn Miller Orchestra." On December 15, 1944, Glenn Miller was aboard an armed services airplane that crashed in the English Channel. One year later, he was pronounced dead. Glenn Miller's last will and testament did not contain an express provision bequeathing his publicity rights, trademarks or other intellectual property rights. His widow, Helen Miller, inherited the residue of his will, which would include whatever intellectual property rights he had.

> FN1.  Plaintiffs lamely dispute some of the facts cited in this Order on the ground that "Plaintiffs have no independent knowledge of the alleged fact." *See, e.g., # 19.* However, pursuant to Local Rule 56-3 and the Court's standing Scheduling and Case Management Order, in order to genuinely dispute a material fact, Plaintiffs must submit a declaration or other written evidence.

On either April 20, 1956 or April 23, 1956[FN2], David Mackay, Sr. (Glenn Miller's close friend and lawyer during his lifetime) incorporated Glenn Miller Productions, Inc. ("GMP"). GMP's Certificate of Incorporation specifies that among GMP's many purposes were:

> FN2.  The parties dispute the exact date.

(c) To manufacture, purchase, sell and generally to trade and deal in and with goods, wares, products and merchandise of

every kind, nature and description . . .

(e) To organize, own, operate, manage, direct, and control, directly or through others, one or more orchestras or musical organizations and to acquire by loan, hiring, purchase, agreement, or other lawful means, the right to use and deal in or with and to authorize others to use and deal in or with the name, likeness, music, scores, arrangements and musical style of others heretofore or hereafter engaged in the field of music.

(i) To acquire copyrights, licenses or other rights to or in plays, films, dramas, dramatizations, musical compositions and intellectual properties of all kinds.

*See Mackay Decl., Exh. A(7-9).* Despite the broad grant of authority conferred by GMP's Certificate of Incorporation, at GMP's first Board of Director's meeting on April 25, 1956, David Mackay, Sr. stated that "the main business of the corporation would be to own and operate a traveling orchestra." *See Mackay Decl., Exh. B (20).*

At the first Board of Director's meeting, David Mackay, Sr. was elected President of GMP and he remained president until his death in 1980. Helen Miller was elected Vice-President of GMP and she served in that role until her death in 1966. GMP also employed Helen Miller as a technical advisor. David Mackay, Sr. and Helen Miller each owned 50% of the shares of GMP until the times of their respective deaths.

Sometime between April 25, 1956 and June 6, 1956[FN3] (in any case, shortly after GMP was incorporated), Helen Miller executed a written license agreement (the "1956 license agreement") in favor of GMP. The agreement consisted of one paragraph which read, in its entirety:

FN3. The parties dispute the exact date.

For and in consideration of the sum of ONE AND NO 100THS ($1.00) DOLLAR and other good and valuable consideration, the undersigned, individually and as Executrix of

the estate of Glenn Miller deceased, hereby grants to Glenn Miller Productions, Inc. the right and license to use the name and likeness of Glenn Miller and the library of music belonging to the Estate of Glenn Miller and/or the undersigned in connection with the business activities of Glenn Miller Productions, Inc.

*See Wolf Decl., Exh. C.* Notwithstanding the amount of consideration (*i.e.,* $1.00) specified in the 1956 license agreement, the minutes of a June 6, 1956 GMP Board meeting state that the Board agreed to pay Helen Miller $13,000 per year in return**\*928** for permission to use Glenn Miller's name, likeness and library of music (the same rights conveyed by the 1956 license agreement). *See Mackay Decl., Exh. C(24).*

Sometime after the 1956 license agreement was executed, GMP began operating an orchestra called the Glenn Miller Orchestra and engaging in a variety of promotional activities. GMP entered into a written contract for the Glenn Miller Orchestra to perform at Washington & Lee University on June 6, 1956. *Id., Exh. H.* In addition, the minutes of a June 2, 1961 GMP Board meeting indicate that in 1961, GMP authorized a zero-interest $30,000 loan to a production company to produce a television show on CBS titled "Glenn Miller Time" featuring the Glenn Miller Orchestra. *Id., Exh. I.* The minutes also reflect that the production company received the rights to "use the Glenn Miller name, picture, likeness, music and arrangements in connection with the television show, and usual accompanying promotion and publicity." *Id.* There is no evidence in the record that Helen Miller objected to this licensing of Glenn Miller's name, likeness and publicity rights. Finally, minutes from an August 26, 1971 GMP Board meeting indicate that in 1971, GMP's Board of Directors ratified GMP's agreement to purchase 1,000 copies of a book entitled "Glenn Miller Discography" in order to support its publication. *Id., Exh. J.*

In 1965, GMP obtained a federal trademark registration for the "Glenn Miller Orchestra" mark, which it renewed in 1985. *Id., Exhs. E-F.*

Helen Miller died on June 2, 1966. Helen Miller's will established a testamentary trust containing her GMP shares. The will named David Mackay, Sr. as the trustee. In his capacity as trustee, David Mackay, Sr. later sold Helen Miller's GMP shares to GMP for $115,000. *See Req. for Judicial Notice, Exh. C.* Upon Helen Miller's death, David Mackay, Jr. (the son of David Mackay, Sr.) was appointed vice president of GMP (Helen Miller's former position).

Like her deceased husband's will, Helen Miller's will did not contain an express provision which bequeathed any of Glenn Miller's publicity rights, trademarks or other intellectual property rights that she may have inherited. Her two adopted children, Steven Miller and Jonnie Soper Miller, would have inherited any such rights only through the residue of Helen Miller's will.

In the late 1970s, Steven and Jonnie Miller filed three separate lawsuits against David Mackay, Sr. in Los Angeles, New York and New Jersey based in part on a dispute over the ownership of GMP.[FN4] On April 23, 1980, the parties entered into an oral stipulation ("the settlement agreement"), which is reflected on the record of the Supreme Court of the State of New York, settling the New York and Los Angeles lawsuits. As part of the settlement agreement, the parties agreed as follows:

> FN4.   According to a brief filed by Jonnie Miller in the New Jersey Supreme Court, the complaint in the New Jersey action alleged that David Mackay, Sr. had breached his fiduciary duties and exerted undue influence over the Millers in order to gain personal financial advantage. *See Bonfiglio Decl., Exh. A(4).* Steven Miller testified at his deposition that the California litigation concerned Steven and Jonnie Miller's accusation that David Mackay, Sr. had cheated them out of a one-half ownership interest in GMP. *See Eisenberg Decl., Miller Depo. (19).*

Petitioners [Jonnie and Steven Miller] ratify and confirm the agreement dated April 25, 1956, made by Helen Miller granting inter alia Glenn Miller Productions, Inc. 'The right and license to use the name and likeness of Glenn Miller **\*929** and/or [Helen Miller]' and petitioners agree not to directly or indirectly organize and/or operate or cause to be organized and/or operate a band or orchestra using the name of Glenn Miller or any facsimile thereof. Respondent [presumably, David Mackay, Sr. or GMP] agrees to pay the petitioners the sum of $50,000.00 ($25,000.00 to each petitioner) in consideration of Glenn Miller Productions, Inc., past and continued use in perpetuity of the name, likeness and library of music of Glenn Miller.

*See Wolf Decl., Exh. D (65-66).* The New Jersey lawsuit did not settle, and it ended in a ruling by the New Jersey Supreme Court in favor of the Millers.

In 1979, Steven Miller retired from his job as a police officer for the Monrovia police department.**FN5** A draft pleading prepared by an attorney for Steven Miller, dated April 7, 1980, and entitled "Amended Petition for Removing Personal Representative," (*i.e.,* David Mackay, Sr.), suggests that in 1980, Steven Miller attempted to remove David Mackay, Sr. as the personal representative of Helen Miller's estate. Paragraph 42 of the draft pleading reads: "Prior to the death of Helen Miller, Mackay acquired one-half of the issued and outstanding stock of two corporations which own and operate the Glenn Miller Bands which have continued to play throughout the world since the death of Glenn Miller." *See Eisenberg Decl., Exh 37(17).* The record does not indicate whether such a pleading was actually filed in the Los Angeles Superior Court.

> FN5.  Since his retirement, Steven Miller has described himself has having participated in the administration of GMP matters. *See Eisenberg Decl., Miller Depo. (15).* Since 1979, Jonnie Miller has assisted him in doing so. *Id. (15-16).*

On May 12, 1980, David Mackay, Sr. died. Upon his death, David Mackey, Jr. became the president of GMP.

Since at least the 1980s, an ensemble calling itself the Glenn Miller Orchestra has performed at many events and festivals, including at the yearly Glenn Miller Birthplace Society Festival in Iowa and the yearly Dancing on the Plains festival in Colorado. *See Mackay Decl.* ¶ 12. Since 1981, GMP has operated one regular Glenn Miller Orchestra band, as well as "special units" of the Glenn Miller Orchestra which supplement the regular Glenn Miller Orchestra band during times of high demand. *Id.* ¶ 13. These "special units" are comprised of different band leaders and musicians hired and supervised by GMP, and they work on a performance-by-performance basis. *Id.* Since 1988, the regular Glenn Miller Orchestra has been led by Larry O'Brien. *Id.* Between the 1990s and the present, Steven Miller has attended approximately 6 Glenn Miller Orchestra performances, all of which he believes were led by Larry O'Brien. *See Eisenberg Decl., Miller Depo. (22-24).*

Also since 1988, GMP has sub-licensed to third parties the right to operate orchestras called the Glenn Miller Orchestra. *Id.* ¶ 14. These sub-licensees have operated Glenn Miller Orchestras in the United States, Canada, Germany and the United Kingdom. Currently, GMP has two sub-licensees: Schmidt & Salden GmbH & Co., which operates in Germany, and Ray McVay, who operates in the United Kingdom. *See Mackay Decl., Exhs. L, O.* Both sub-license agreements set forth detailed "performance standards" which provide, for example, that the orchestra shall consist of at least 16 musicians plus a leader and one male and one female vocalist, that the sub-licensee's bandstands must be similar to that used by the Glenn Miller Orchestra operated by GMP, that the orchestra shall consist of a particular number of various types of instruments, and that the orchestra "shall at all times behave and be **\*930** groomed in accordance with the highest standards of the Glenn Miller Orchestra." *Id.* The sub-license agreements also provide that a failure to conform to those

standards constitutes a default. *Id.* Finally, the sub-license agreements provide that they are not assignable or transferable. *Id.* Counsel for GMP represented at the hearing on these motions that David Mackay, Jr. assures that the sub-licensees are complying with the terms of the sub-license agreements by observing their performances and monitoring their bookings.

Beginning in 1983, GMP also has been selling merchandise, including cassette tapes, videotapes, CDs, DVDs, t-shirts and polo shirts bearing the "Glenn Miller Orchestra" mark or the "GMO" logo. *See Mackay Decl.* ¶ 9. This merchandise is sold primarily at GMO performances. *Id.* ¶ 10. During each performance, an announcement is made regarding the sale of merchandise, and a table displaying merchandise is set up in a prominent location. *Id.* Since September of 1998, merchandise has also been available on GMP's website, (*www.glenmillerorchestra.com). Id.* ¶ 11. Counsel for GMP represented at the hearing that GMP's annual worldwide revenue is approximately $2 million dollars.

During the 1980s and 1990s, counsel for Steven and Jonnie Miller sent at least eight cease and desist letters to third parties who were not authorized to use or otherwise exploit Glenn Miller's name or likeness, but who were, nevertheless, apparently doing so. *See Eisenberg Decl., Exhs. 41-47; Miller Decl., Exh. B.* Although most of these letters were sent to alleged infringers in the United States, one letter was sent to a man in the Republic of South Africa who had allegedly formed an unauthorized Glenn Miller Society in South Africa. *See Eisenberg Decl., Exh. 42.* However, the Millers never sent any cease and desist letters to GMP. Indeed, before they filed this lawsuit, the Millers had never communicated with GMP regarding any qualitative aspect of GMP's business activities, such as its operation of the Glenn Miller Orchestra, its sub-licensing to third parties of the right to operate a Glenn Miller Orchestra, or its sale of merchandise bearing the "Glenn Miller Orchestra" mark. *See Mackay Decl.* ¶ 2.

There are currently approximately 300 GMP shares outstanding, most of which are owned by David Mackay, Jr. In 1992 and 1993, Jonnie Miller and Steven Miller (respectively) became GMP shareholders by purchasing shares from David Mackay, Jr.'s stepbrother, Samuel Clark. *See Eisenberg Decl., Miller Depo. (20).* Steven Miller currently owns eleven shares in GMP and Jonnie Miller owns one share. *Id. (20-21).* GMP sends its shareholders, including Jonnie and Steven Miller, yearly financial information about GMP's operations, including GMP's financial statements. *See O'Reilly Decl., Exhs. A-O.* The record indicates that some of these financial statements were sent directly to Steven Miller, and others were sent to his counsel, Laura Ben-Porat of Gibson, Dunn & Crutcher. *Id.* Included in GMP's financials were its income statements, each of which contained line items for "Licensing U.S.," "Licensing U.K.," and "Licensing Europe." *Id.*

In 1994, the Millers hired the Roger Richman Agency, for a period of two years, to be their exclusive licensing agent for use of the Glenn Miller name "in connection with all video recording and tapes; look-alikes; sound-alikes; advertising; commercials; theater and other dramatic uses; animation; newspaper; book and magazine syndication; endorsements; promotions; premiums; sale of merchandise and/or use in all services." *See Eisenberg Decl., Exh. 49(1).* However, excluded from the grant of rights to the Roger Richman Agency were rights previously **\*931** granted by GMP to certain third parties, including "Orchestras of Glenn Miller Productions, Inc., a New York Corporation." *Id. (6).* In 1996, the Millers hired Plaintiff CMG Worldwide, Inc. ("CMG") to be their exclusive licensing agent, subject to the same exclusion for the pre-existing rights of "Orchestras of Glenn Miller Productions, Inc., a New York Corporation." *Id., Exh. 50 (1, 7).*

In 1999, Steven Miller filed trademark applications with the PTO for the mark "Glenn Miller" in connection with various classes of goods and services, including clothing, paper goods, housewares, glass and entertainment activities. *See*

*Bonfiglio Decl., Exhs. B-F.* However, the PTO rejected Steven Miller's applications due to the likelihood of confusion with GMP's already registered "Glenn Miller Orchestra" mark. *Id., Exhs. G-K.* On June 2, 2001, the PTO deemed Steven Miller's applications abandoned. *Id., Exhs. L-P.* Sometime later in 2001, Steven Miller filed new applications for the Glenn Miller mark. GMP has opposed those applications, and all proceedings by the PTO have been stayed pending the outcome of this litigation. *Id., Exh. Q.*

Steven Miller claims that he first learned in 2000 or 2001 that there was more than one functioning Glenn Miller Orchestra, although he does not specify how he learned. *See Miller Decl.* ¶ 9. Steven Miller also claims that he did not learn until April 2003 (after filing this lawsuit) that GMP has entered into sub-license agreements with third parties to use Glenn Miller's name and likeness in the United States and in foreign counties. *Id.* The record does not indicate when Steven Miller learned that GMP has been selling merchandise bearing the Glenn Miller Orchestra mark.

On June 22, 2003, Steven Miller, Jonnie Miller, and CMG Worldwide, Inc. (collectively "Plaintiffs") filed this action against GMP, asserting eleven claims for relief: (1) breach of written contract; (2) termination of written contract; (3) infringement of statutory right of publicity; (4) violation of 15 U.S.C. § 1125(a); (5) intentional interference with economic advantage; (6) federal statutory dilution; (7) state statutory dilution; (8) violation of Cal. Business & Professions Code § 17200; (9) conversion; (10) accounting; and (11) declaratory relief, all based on GMP's sale of merchandise bearing Glenn Miller's name, likeness and identity, and GMP's sub-licensing to third parties of the right to operate orchestras named the Glenn Miller Orchestra.

Plaintiffs currently move for summary adjudication of one narrow issue in this case. They seek a ruling from the Court that GMP may not sub-license any intellectual property rights

conveyed to it pursuant to the 1956 license agreement without express permission from the licensors (now the Millers), and therefore that GMP's admitted sub-licensing constitutes a material breach of the 1956 license agreement. Defendant has filed a cross-motion for summary judgment, contending that the 1956 license agreement and 1980 settlement agreement give GMP the right to sell merchandise and to operate and sub-license multiple bands, and in any case, that all of Plaintiffs' claims are barred by the doctrine of laches. Although the Court ultimately finds that Plaintiffs' claims are barred by the doctrines of estoppel and laches, the Court will proceed to examine the other issues raised by the parties because the Court anticipates an appeal from the laches ruling and believes that if the Court is found to be in error, on remand it would be in the parties' best interest to have their respective rights and obligations previously clarified. Indeed, such clarification may assist the parties in settling their surprisingly bitter and very costly dispute.

## *932 ANALYSIS

### A. *The Legal Standard for a Motion for Summary Judgment.*

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id.* at 248, 106 S.Ct. 2505. The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transportation Brokerage Co., Inc. v. Darden Restaurants, Inc.,* 213 F.3d 474, 480 (9th Cir.2000) (citations omitted). In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.' " *Cleveland v. Policy Management Sys. Corp.,* 526 U.S. 795, 805-06, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (*citing Celotex,* 477 U.S. at 322, 106 S.Ct. 2548).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ.P. 56(e). Summary judgment will be entered against the non-moving party if that party does not present such specific facts. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.; Beyene v. Coleman Sec. Serv., Inc.,* 854 F.2d 1179, 1181 (9th Cir.1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable

inferences are to be drawn in [that party's] favor.' " *Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

Simply because the facts are undisputed does not make summary judgment appropriate. Instead, where divergent ultimate inferences may reasonably be drawn from the undisputed facts, summary judgment is improper. *See* **\*933** *Braxton-Secret v. A.H. Robins Co.,* 769 F.2d 528, 531 (9th Cir.1985).

### B. *Plaintiffs' Motion for Summary Adjudication: May GMP Sub-License Intellectual Property Rights Without Plaintiffs' Permission?*

It is well established in patent and copyright law that a patent or copyright licensee may not sub-license his licensed intellectual property rights without express permission from the licensor. *See Gardner v. Nike, Inc.,* 279 F.3d 774 (9th Cir.2002); *Everex Systems v. Cadtrak Corp.,* 89 F.3d 673, 679 (9th Cir.1996). (The Court will henceforth refer to this rule as "the sub-licensing rule.") Although the Ninth Circuit has not addressed whether the sub-licensing rule applies to trademark licenses, the courts that have addressed the issue have uniformly held it does, and thus that a trademark licensee may not sub-license a mark without express permission from the licensor. *See Tap Publications, Inc. v. Chinese Yellow Pages (New York), Inc.,* 925 F.Supp. 212, 218 (S.D.N.Y.1996); *In re Travelot Co.,* 286 B.R. 447, 455 (Bankr.S.D.Ga.2002); *Raufast S.A. v. Kicker's Pizzazz Ltd.,* 208 U.S.P.Q. 699, 703, 1980 WL 30295, 1980 U.S. Dist. LEXIS 16490 \*12-13

(E.D.N.Y.1980); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 18:43 (4th ed.) (hereinafter "*McCarthy*"). The reasoning behind the courts' extension of the sub-licensing rule to the trademark context is that, "[s]ince the licensor-trademark owner has the duty to control the quality of goods sold under its mark, it must have the right to pass upon the abilities of new potential licensees." *McCarthy, supra,* § 25:33.

In Plaintiffs' motion for summary adjudication, Plaintiffs ask the Court to apply the sub-licensing rule (previously recognized by courts in *Tap, Travelot* and *Raufast*) to trademark licenses. Plaintiffs also ask the Court to extend the sub-licensing rule to licenses of publicity rights.[FN6] Finally, Plaintiffs seek a ruling that because the 1956 license agreement did not grant GMP express permission to sub-license, GMP does not have the right to sub-license any intellectual property rights it obtained under the 1956 license agreement.

> FN6. Fundamentally, the right of publicity "is the inherent right of every human being to control the commercial use of his or her identity." *See McCarthy, supra,* § 28:3. California law recognizes both a statutory and common law right of publicity. The statutory right of publicity is codified in Cal. Civil Code § 3344, which provides in relevant part: "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, . . . for purposes of advertising or selling, . . . without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof." California's common-law right of publicity protects an individual's name and likeness from appropriation for either commercial or non-commercial purposes. *See Wendt v. Host Int'l, Inc.,* 125 F.3d 806, 811 (9th Cir.1997). The right to publicity extends 70 years beyond an individual's death. *See McCarthy, supra,* § 28:27; Cal. Civ.Code § 3344.1.

### 1. *Defendant's Threshold Arguments That the 1956 Agreement Did Not Convey a License.*

Defendant argues, first, that as a matter of contract law, the 1956 agreement between Helen Miller and GMP did not convey a license. Defendant also argues that even if the parties did intend the agreement to convey a license, at the time, there were no existing trademark rights that could be licensed.

**\*934** a. *The Only Reasonable Interpretation of the 1956 Agreement is That it Conveys to GMP Both a Trademark License and a License of Glenn Miller's Publicity Rights.*

The threshold question is: what rights did the 1956 licensing agreement convey to GMP? Plaintiffs argue that the license agreement conveyed a trademark license to GMP. GMP first argues in opposition that the 1956 agreement did not convey a trademark license, but instead a license of Glenn Miller's right to publicity. In Plaintiffs' reply brief, Plaintiffs contend (somewhat inconsistently with their opening brief) that the 1956 agreement "transfers a bundle of rights, including trademark rights and publicity rights." *See Reply* at 13. In any case, Plaintiffs contend in their reply brief that the exact categorization of the rights conveyed by the 1956 licensing agreement is not relevant because the sub-licensing rule should apply to *all* areas of intellectual property. *Id.* However, if Plaintiffs are wrong about the scope of the rights conveyed to GMP by the 1956 agreement, the Court would not have to address whether the sub-licensing rule should be extended to licenses of trademarks and publicity rights.

Courts apply general principles of contract interpretation when interpreting the terms and scope of a licensing agreement. *See Mendler v. Winterland Production, Ltd.,* 207 F.3d 1119, 1121 (9th Cir.2000). "[T]he fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting." *See United States Cellular Invest. Co. of Los Angeles v. GTE Mobilnet,*

*Inc.,* 281 F.3d 929, 934 (9th Cir.2002). Under California law[FN7], "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *See Pacific Gas and Electric Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 442 P.2d 641 (1968) (in bank); *United States v. King Features Entertainment, Inc.,* 843 F.2d 394, 398 (9th Cir.1988). Because California law recognizes that the words of a written instrument often lack a clear meaning apart from the context in which the words were written, courts may preliminarily consider any extrinsic evidence offered by the parties. "If the court decides, after consideration of this evidence, that the language of a contract, in the light of all the circumstances, is 'fairly susceptible of either one of the two interpretations contended for,' extrinsic evidence relevant to prove either of such meanings is admissible." *Pacific Gas,* 69 Cal.2d at 38-40, 69 Cal.Rptr. 561, 442 P.2d 641; *United States Cellular Invest. Co.,* 281 F.3d at 939. Extrinsic evidence includes testimony regarding the circumstances in which a contract was written, the subsequent conduct of the parties, and the common usage of particular terms in a given industry. *See Pacific Gas,* 69 Cal.2d at 38-39, 69 Cal.Rptr. 561, 442 P.2d 641; *United States Cellular Invest. Co.,* 281 F.3d at 937; *United Cal. Bank v. THC Financial Corp.,* 557 F.2d 1351, 1360 (9th Cir.1977).

> FN7. The agreement lacks a choice of law clause. Given the absence of any argument by the parties that California law does not govern the agreement, the Court will apply California law in construing it.

If, after considering the language of the contract and any admissible extrinsic evidence, the meaning of the contract is unambiguous, a court may properly interpret it on a motion for summary judgment. *See Southern California Gas Co. v.*

*City of Santa Ana,* 336 F.3d 885 (9th Cir.2003). **\*935** However, if the interpretation turns upon the credibility of conflicting extrinsic evidence, or if "construing the evidence in the nonmovant's favor, the ambiguity can be resolved consistent with the nonmovant's position," summary judgment is inappropriate. *Id.; Cejay Parsons v. Bristol Devel. Co.,* 62 Cal.2d 861, 865-66, 44 Cal.Rptr. 767, 402 P.2d 839 (1965).

The 1956 license agreement conveyed to GMP "the right and license to use the name and likeness of Glenn Miller . . . in connection with the business activities of [GMP]." *See Wolf Decl., Exh. C.* The license agreement does not explicitly convey to GMP either the right to license any existing Glenn Miller trademark or Glenn Miller's publicity rights, or both. However, the terms "name" and/or "likeness" are found in both the Lanham Act definition of a trademark and in the definitions of California's statutory and common law rights to publicity.**FN8** Because the 1956 agreement is ambiguous on its face and is reasonably susceptible to multiple interpretations, extrinsic evidence is admissible to prove the parties' intent when they executed the agreement. *See Pacific Gas,* 69 Cal.2d at 38-40, 69 Cal.Rptr. 561, 442 P.2d 641.

> FN8.   The Lanham Act defines a trademark as including "any word, name, symbol, or device, or any combination thereof" used by a person "to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *15 U.S.C. § 1127.* Similarly, under both California statutory and common law, the right of publicity protects against the appropriation by others of one's "name, voice, signature, photograph, or likeness." *See Cal. Civ.Code § 3344; Wendt v. Host Int'l, Inc.,* 125 F.3d 806, 810-11 (9th Cir.1997).

It is undisputed that Helen Miller executed the 1956 license agreement shortly after incorporating GMP. The proximity of the two events, the undisputed fact that after its formation and

until the execution of the license agreement, GMP did not conduct any business beyond electing officers and drafting bylaws, and GMP's use of the name "Glenn Miller" in its own name, strongly suggest that GMP was incorporated for the specific purpose of conducting business related to Glenn Miller, notwithstanding that the Certificate of Incorporation speaks more generally about its purposes. (See pages 2-3, *supra.*) In addition, as described above, GMP's Certificate of Incorporation provided that GMP was authorized to "manufacture, purchase, sell and generally to trade and deal in and with goods, wares, products and merchandise of every kind, nature and description" as well as to "organize, own, operate, manage, direct and control, directly or through others, one or more orchestras or musical organizations." *See Mackay Decl., Exh. A(7-9).* It is hard to imagine that GMP would be able to sell and trade merchandise and operate orchestras bearing the Glenn Miller mark without exploiting Glenn Miller's identity or likeness for promotional purposes. Likewise, it is hard to imagine that GMP could exploit Glenn Miller's publicity rights without using a trademark containing the Glenn Miller name. Therefore, the Court finds that 1956 agreement is susceptible to only one reasonable interpretation-that it conveys both a trademark license and a license of Glenn Miller's publicity rights.

b.   *The Court Rejects GMP's Arguments That, as a Matter of Law, the 1956 Agreement Could Not Have Conveyed a Trademark License.*

GMP next argues that regardless of how the terms are construed, as a matter of law, the 1956 agreement could not have conveyed a trademark license to GMP because neither Plaintiffs nor their predecessors owned a "Glenn Miller" trademark in 1956. Therefore, GMP argues, the 1956 **\*936** agreement must have conveyed only a license of Glenn Miller's publicity rights. This argument is unpersuasive.

An individual may acquire trademark protection in a personal name in one of two ways. First, an individual may obtain a

federal trademark registration from the Patent and Trademark Office. *See McCarthy, supra,* § 16:19. It is undisputed that neither Plaintiffs nor their predecessors have, at any time, obtained a federal registration for the mark "Glenn Miller." Second, an individual may prove that through usage, a personal name has acquired a secondary meaning. *See McCarthy, supra,* § 13.2. "Secondary meaning is the consumer's association of the mark with a particular source or sponsor." *See E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1291 (9th Cir.1992). In determining whether a mark has obtained secondary meaning, courts consider: (1) whether actual purchasers of the product bearing the mark associate the mark with the producer; (2) the degree and manner of advertising under the mark; (3) the length and manner of use of the mark; and (4) whether use of the mark has been exclusive. *See Comm. for Idaho's High Desert v. Yost,* 92 F.3d 814, 822 (9th Cir.1996). Whether a claimed mark has obtained a secondary meaning is a question of fact to be determined by a jury. *See Igloo Products Corp. v. Brantex, Inc.,* 202 F.3d 814, 818 (5th Cir.2000).

Plaintiffs present evidence of pre-1956 advertising and use of the Glenn Miller name in connection with the sale of goods and services, such as radio shows, advertisements for agents, record labels, cigarettes, transcription services, concerts, record compilations, musical instruments, commemorative clothing, photographs and specialty items. *See Steven Miller Decl., ¶¶ 4-19, Exh. A.* This evidence is sufficient to permit a reasonable jury to conclude that by 1956, consumers associated the name "Glenn Miller" with a particular source or quality of product, and thus that the Glenn Miller name had acquired a secondary meaning. Therefore, the Court rejects GMP's argument that the 1956 agreement could not have conveyed a trademark license because in 1956 Helen Miller had no trademark to convey.

GMP also argues that the 1956 agreement could not have conveyed a trademark license because the agreement did not con-

tain a provision for the supervision and control over the goods and services GMP produced under the license. It is well established that when the owner of a trademark licenses the mark to others, he retains a "duty to exercise control and supervision over the licensee's use of the mark." *See Sheila's Shine Products, Inc. v. Sheila Shine, Inc.,* 486 F.2d 114, 123-24 (5th Cir.1973); *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir.1971). However, a provision recognizing the licensor's supervision and control is not an essential element of a trademark license. *See Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 368 (2nd Cir.1959) ("The absence of an express contract right to inspect and supervise a licensee's operations does not mean that the plaintiff's method of licensing failed to comply with the requirements of the Lanham Act. Plaintiff may have in fact exercised control in spite of the absence of any express grant by licensees of the right to inspect and supervise"); *Bunn-O-Matic Corp. v. Bunn Coffee Service, Inc.,* 88 F.Supp.2d 914 (C.D.Ill.2000) (holding that an agreement conveyed a trademark license despite the agreement's lack of an explicit quality control provision). A license agreement need not contain an express quality control provision because trademark law, rather than the contract itself, confers on the licensor the right and obligation to exercise quality control. *See* **\*937** *McCarthy, supra,* § 18:59. Therefore, the lack of a quality control provision in the 1956 agreement does not mean that Helen Miller could not have conveyed a valid trademark license to GMP.

Having found, first, that the only reasonable interpretation of the language of the 1956 agreement is that it conveyed both a trademark license and a license of Glenn Miller's publicity rights, and second, that a jury could reasonably find that Helen Miller owned a trademark that she could license, the Court now will turn to the merits of Plaintiffs' summary adjudication motion.

2. *The Policy Reasons For the Sub-Licensing Rule in the Patent and Copyright Contexts Support Extending the Rule to the Trademark Context.*

Acting on its own, GMP has sub-licensed to third parties the rights it acquired in the 1956 agreement. Could it do so, lawfully? In *Harris v. Emus Records Corp.,* 734 F.2d 1329 (9th Cir.1984), the Ninth Circuit addressed for the first time whether under the 1909 Copyright Act, a copyright licensee could transfer his license to a third party without permission from the original licensor. The Ninth Circuit held that a copyright licensee could not do so. *Id.* at 1334. In support of its ruling, the Ninth Circuit discussed several policy issues, including that a copyright licensor's retained rights in the copyright would be jeopardized if the licensee could sublicense without notifying or receiving permission from him. *Id.* The Ninth Circuit reasoned: "By licensing rather than assigning his interest in the copyright, the owner reserves certain rights, including that of collecting royalties. His ability to monitor use would be jeopardized by allowing sublicensing without notice." *Id.* Eighteen years later, in *Gardner v. Nike, Inc.,* 279 F.3d 774, 781 (9th Cir.2002), the Ninth Circuit held that the same rule applied to the 1976 Copyright Act, for the same reason. In addition to agreeing with the *Harris* court's concern about the ability of a copyright licensor to monitor use, the Ninth Circuit also recognized that in the absence of such a requirement, disputes between a licensor and a licensee regarding whether a sub-licensee was acting within the scope of the original license would trigger litigation (an undesirable result). *Id.*

The policy rationales cited by the Ninth Circuit in *Harris* and *Gardner* apply with equal force to the sub-licensing of trademarks. As discussed above, a trademark owner has an affirmative duty to supervise and control the licensee's use of its mark, in order to protect the public's expectation that all products sold under a particular mark derive from a common source and are of like quality. *See McCarthy, supra,* §§ 18:42,

18:48. Licensors who fail to meet this obligation may lose their right to enforce the trademark license. *Id.* § 18:48. Common sense suggests that if a trademark licensee could unilaterally sub-license a mark without notifying or obtaining consent from the licensor, then a trademark licensor would lose his ability to police his mark, thereby becoming estopped from enforcing his ownership rights vis-a-vis the licensee. Such a result is illogical, undesirable, and at odds with the nature of intellectual property rights. Moreover, if a trademark licensor could not control the capacity of a licensee to sub-license its mark, then disputes about the suitability of a potential sub-licensee or about whether a sub-licensee is acting within the scope of the original license would trigger litigation. As the Ninth Circuit recognized in *Gardner,* this result is also undesirable.

The Court acknowledges that, as GMP points out in its opposition and the Supreme Court has recognized, there are **\*938** "fundamental differences" between patent and copyright law on the one hand, and trademark law on the other hand. *See Sony Corp. of America v. Universal City Studios,* 464 U.S. 417, 439 n. 19, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). For example, while the basic policies underlying copyright and patent protection are to encourage creative authorship and invention, the purposes of trademark protection are to protect the public's expectation regarding the source and quality of goods. *Id.* at 429, 104 S.Ct. 774; *McCarthy, supra,* §§ 3:4-3:11. However, despite these differences, copyright and trademark licensors share a common retained interest in the ownership of their intellectual property-an interest that would be severely diminished if a licensee were allowed to sub-license without the licensor's express permission. For these reasons, the Court finds that the policies underlying the sub-licensing rule in patent and copyright law apply with equal force to trademark law. Accordingly, a trademark licensee such as GMP may not sub-license without express permission from the original licensor.

### 3.  *The Same Policies Also Support an Extension of the Sub-licensing Rule to Licenses of Publicity Rights.*

Plaintiffs also argue that the sub-licensing rule should apply to licenses of an individual's publicity rights. Plaintiffs cite no authority for this proposition, but merely rely on the same policy arguments and rationales discussed above.

Although trademarks and publicity rights share many common features, they are also dissimilar in several ways. For example, while trademark laws protect the trademark owner by fortifying the public's expectation regarding the source and quality of goods and services, the right of publicity protects an individual's "persona" from commercial exploitation by others. *See McCarthy, supra,* §§ 29:8-29:9. However, the distinction most relevant for the purposes of this motion is that a licensor of an individual's publicity rights, unlike a trademark licensor, lacks an affirmative statutory or common law duty to police its license and to ensure that the licensee is maintaining sufficient quality controls. *See McCarthy, supra,* § 28:14. Therefore, one of the two policy rationales supporting the extension of the sub-licensing rule to trademark licenses-that unfettered sub-licensing will prevent the licensor from satisfying his obligation to supervise the licensee-does not apply to licenses of publicity rights.

Nevertheless, a licensor of publicity rights may, in many instances-indeed, in probably *all* instances and respects-have a powerful incentive to supervise the licensee's use of those rights. The facts of this case are instructive. If GMP were permitted to sub-license Glenn Miller's publicity rights without notifying or obtaining permission from the owner of those rights-Plaintiffs, as this Court has found-it could sub-license Glenn Miller's publicity rights to a third party who used his name or photograph or likeness to promote fascism or pornography. Such use presumably would horrify Glenn Miller if he were alive; it also would adversely affect the image of Glenn Miller that Plaintiffs (successors to their mother, the

original licensor) may wish to preserve. However, absent a sub-licensing rule, Plaintiffs would have no ability to prevent GMP from sullying their father's name (and, in fact, would have no right to even know that GMP was doing so). In addition, any disputes about whether GMP could sub-license Glenn Miller's right of publicity to a particular third party, or whether a third party sub-licensee was acting beyond the scope of the original license, would trigger litigation. These are undesirable results.

Moreover, in practice, many licenses convey both trademark rights and publicity **\*939** rights. In such cases, "the special rules of trademark licensing must be followed in order to preserve the trademark significance of the licensed identity or persona." *McCarthy, supra,* § 28:14. Again, the facts of this case help illustrate this principle. If, without Plaintiffs' knowledge or permission, GMP could sub-license the Glenn Miller mark to third parties who use the mark to sell products or causes at odds with what Glenn Miller stood for, the public's image of Glenn Miller's persona surely would become tainted in a manner that Plaintiffs did not intend. Conversely, if GMP could sub-license Glenn Miller's publicity rights to third parties who use his name or photograph or likeness to sell a wide variety of products whose quality is not controlled, then the Glenn Miller mark may become diluted. For these reasons, at least in cases such as this one in which a license conveys both trademark and publicity rights, the sub-licensing rule should be extended to cover publicity rights.

For these reasons, if a jury were to find that at the time Helen Miller executed the 1956 license agreement, she actually had a trademark in Glenn Miller's name to convey, then because the 1956 license agreement does not expressly grant GMP unilateral authority to sub-license the mark, GMP may not do so. In addition, because the 1956 license agreement does not grant GMP express permission to unilaterally sub-license Glenn Miller's publicity rights, GMP may not do so.

### 4.  *Estoppel.*

Finally, GMP argues that Plaintiffs are estopped from enforcing the terms of any trademark license Helen Miller conveyed to GMP in the 1956 agreement because Plaintiffs have failed to affirmatively supervise and control the quality of the goods and services provided under the license. Although GMP properly asserts this defense in opposition to Plaintiffs' motion for summary adjudication, the Court chooses to deal with it in the next section (regarding GMP's motion for summary judgment).

### C.  *Defendant's Motion for Summary Judgment.*

GMP has filed a cross-motion for summary judgment, contending that: (1) the 1956 license agreement and 1980 settlement agreement grant GMP the right to sell merchandise bearing the Glenn Miller Orchestra mark; (2) the same two agreements grant GMP the right to operate and sub-license multiple bands; (3) because GMP has the right to sell merchandise and to operate and sub-license multiple bands, all of Plaintiffs' eleven claims for relief necessarily fail; and (4) all of Plaintiffs' claims are barred by the doctrine of laches. Although the Court rejects GMP's first three contentions, it agrees that Plaintiffs' claims are barred by laches. The Court also finds that Plaintiffs are estopped from enforcing the terms of any trademark license Helen Miller conveyed to GMP in the 1956 agreement.

### 1.  *GMP Lacks the Unilateral Right to Sub-License Multiple Ensembles Using the Name "The Glenn Miller Orchestra."*

GMP argues that the only reasonable interpretation of the 1956 license agreement and the 1980 settlement agreement is that they permit GMP to sub-license to an unlimited number of third parties the right to operate orchestras named the Glenn Miller Orchestra. However, because the Court has

already ruled that a trademark and publicity rights licensee (such as GMP) may not sub-license those rights without the express permission of the licensor, and because it is undisputed that the two agreements do not expressly authorize GMP to sub-license, as a matter of law, GMP lacks the unilateral authority **\*940** to sub-license its right to operate a band named the Glenn Miller Orchestra.

2. *There Are Fact Issues Concerning Any Right of GMP to Directly Operate "Special Units" of the Glenn Miller Orchestra and to Sell Merchandise.*

GMP also argues that the only reasonable interpretation of the 1956 license agreement and the 1980 settlement agreement shows that Helen Miller and Plaintiffs actually granted to GMP the right to itself operate more than one ensemble named the Glenn Miller Orchestra, such as ensembles referred to as "special units,"**FN9** and to sell merchandise bearing the Glenn Miller Orchestra mark,**FN10** including cassette tapes, videotapes, CDs, DVDs, t-shirts and polo shirts. GMP relies on the following undisputed evidence in support of its interpretation:

> FN9.   Since the operation of "special units" does not constitute sub-licensing, the sub-licensing rule does not bar GMP from itself operating more than one Glenn Miller Orchestra absent express permission from the Millers.

> FN10.   At the hearing on these motions, counsel for Plaintiffs represented that Plaintiffs object to the sale of this merchandise only to the extent that it bears the stand-alone "Glenn Miller" name, as compared to the "Glenn Miller Orchestra" mark. Plaintiffs have failed to proffer any evidence whatsoever of such merchandise being sold, which itself is a basis to grant GMP's motion, in addition to the reasons discussed, *infra,* concerning laches.

1. GMP's Certificate of Incorporation provides that GMP is authorized to "organize, operate, manage, direct, and control, directly or through others, one or more orchestras or musical organizations," and to "manufacture, purchase, sell and generally to trade and deal in and with goods, wares, products and merchandise of every kind, nature and description " *Mackay Decl., Exh. A(7-9).*

2. At the time Helen Miller executed the 1956 license agreement, she was a 50% shareholder in GMP. *See Mackay Decl., ¶ 5.*

3. The 1956 license agreement grants GMP the right to use Glenn Miller's name and likeness "in connection with the business activities of Glenn Miller Productions, Inc." *Wolf Decl., Exh. C.*

4. At GMP's first Board of Directors meeting on April 25, 1956, David Mackay, Sr. (the then-chairman) stated: "The main business of the corporation would be to own and operate a traveling orchestra." *See Mackay Decl., Exh. B.*

5. During Helen Miller's lifetime, GMP sought and successfully obtained trademark protection for the "Glenn Miller Orchestra" name, and there is no evidence that Helen Miller objected. *See Mackay Decl., Exhs. E-F.*

6. The 1980 settlement agreement contains a non-compete clause which provides that Steven and Jonnie Miller "agree not to directly or indirectly organize and/or operate or cause to be organized and/or operate a band or orchestra using the name of Glenn Miller or any facsimile thereof." *Wolf Decl., Exh. D (65-66).*

7. GMP has operated "special units" of the Glenn Miller Orchestra since 1981 and Plaintiffs never objected. *Mackay Decl. ¶¶ 13, 22; Eisenberg Decl., Miller Depo. (143).*

8. GMP has openly sold merchandise bearing the Glenn Miller Orchestra mark at concerts since 1983 (six of which Steven Miller attended), and has sold merchandise on its website since September 1998. However, **\*941** Plaintiffs never objected. *Mackay Decl. ¶¶ 9, 11, 22; Eisenberg Decl., Miller Depo. (143).*

In contrast to the foregoing facts, which definitely do constitute powerful evidence favoring GMP, the record also shows that for at least 25 years after the execution of the 1956 license agreement (and during the entirety of Helen Miller and David Mackay, Sr.'s respective lifetimes), GMP did not operate more than one Glenn Miller Orchestra or sell merchandise bearing the Glenn Miller Orchestra mark. *See Mackay Decl.*, ¶¶ 9-14. This lengthy history, which is consistent with the language of item 4, above (" . . . a traveling orchestra"), would at least permit a jury to infer that Helen Miller's intent in executing the 1956 license agreement, and the intent of GMP and the Millers when they entered into the 1980 settlement agreement, was to have only one orchestra. Accordingly, the Court DENIES summary adjudication of this issue.

### 3. *The Relationship Between GMP's Contractual Rights and the Eleven Causes of Action Asserted in the Complaint.*

GMP contends that it has the contractual rights to sell Glenn Miller Orchestra merchandise and to operate and sub-license multiple Glenn Miller Orchestras, and that because all of Plaintiffs' claims for relief are based on GMP's alleged lack of these rights, all of Plaintiffs' claims fail as a matter of law. However, because (as shown above) there are genuine disputes of material fact that preclude the Court from determining the scope of GMP's contractual rights, the Court cannot find that all of Plaintiffs' claims are defeated.

### 4. *Plaintiffs' Claims Are Barred By Laches.*

Next, GMP argues that Plaintiffs' claims (which are all based on GMP's operation or sub-licensing of ensembles named the Glenn Miller Orchestra and its sale of merchandise) are barred by the doctrine of laches, regardless of whether the merchandise contained merely the name "Glenn Miller" instead of "Glenn Miller Orchestra." (See footnote 10.) "Laches is an equitable time limitation on a party's right to bring

suit," which is "derived from the maxim that those who sleep on their rights, lose them." See *Kling v. Hallmark Cards, Inc.,* 225 F.3d 1030, 1036 (9th Cir.2000); *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 820 (7th Cir.1999). It is well established that laches is a valid defense to Lanham Act claims for both monetary damages and injunctive relief. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 840 (9th Cir.2002), *cert. denied,* 537 U.S. 1047, 123 S.Ct. 600, 154 L.Ed.2d 520 (2002); *Hot Wax,* 191 F.3d at 822.

In order to succeed on a defense of laches, a defendant must prove both: (1) an unreasonable delay by plaintiff in bringing suit, and (2) prejudice to himself. *See Couveau v. American Airlines, Inc.,* 218 F.3d 1078 (9th Cir.2000) (per curiam). In considering whether a plaintiff's delay was unreasonable, courts consider: (1) the length of the delay, measured from the time the plaintiff knew or should have known about his potential cause of action, and (2) whether the plaintiff's delay was reasonable, including whether the plaintiff has proffered a legitimate excuse for his delay. *See Jarrow Formulas,* 304 F.3d at 838.

If a plaintiff files suit within the applicable period of limitations for his claim, there is a strong presumption that laches does not bar the claims. *See Jarrow Formulas,* 304 F.3d at 835. Conversely, if any part of the alleged wrongful conduct occurred outside of the limitations period, courts presume that the plaintiff's claims are barred by laches. *Id.* at 836-**\*942** 37. The parties agree that a four year statute of limitations applies to all of Plaintiffs' claims.**FN11** Accordingly, the complaint having been filed on January 22, 2003, claims that accrued and were known or in the exercise of reasonable care would have been known as of January 22, 1999 would be barred.

> FN11. The California statute of limitations for breach of contract claims, statutory right of publicity claims, state trademark infringement and/or dilution claims, and state unfair competition claims is four years. *See*

*Cal.Code Civ. Proc. §§ 337, 343.* The Lanham Act does not contain a statute of limitations, and therefore Lanham Act claims are governed by the analogous state statute of limitations, which in this case are state trademark infringement and dilution claims under Cal. Bus. & Prof.Code §§ 14330 and 14335. *See Jarrow Formulas,* 304 F.3d at 836-37. Therefore, the statute of limitations for all of Plaintiffs' eleven causes of action is four years.

### a. *Plaintiffs' Delay in Bringing Suit.*

Because all of Plaintiffs' claims are governed by a four year statute of limitations, the first issue is whether Plaintiffs actually knew or should have known that GMP was operating or sub-licensing multiple Glenn Miller Orchestras and/or selling Glenn Miller Orchestra merchandise before January 22, 1999. The Court finds that Plaintiffs had constructive notice of GMP's activities long before that time.

### i. *The Operation and Sub-Licensing of Multiple Bands.*

GMP argues that Plaintiffs actually knew, or should reasonably have known, that GMP was operating and/or sub-licensing multiple Glenn Miller Orchestras as early as 1980, and at the latest by 1996. In support of this argument, GMP submits the following undisputed evidence:

1. Steven Miller retired from his other occupation(s) in 1979. Since then, he has been involved in the administration of GMP matters. His sister, Jonnie Miller, has assisted him in doing so. *See Eisenberg Decl., Miller Depo. (15-16).*

2. As counsel for both sides acknowledged at the hearing on these motions, there is a decades-long history of profound ill will between these Plaintiffs and the Mackays, who controlled GMP after Helen's death in 1966. At one point, the Millers were pursuing three lawsuits in three states against David Mackay, Sr. The Millers had the incentive and the means, such as the attorneys mentioned below, to monitor carefully and continuously what GMP was doing concerning perfor-

mances and sales. Indeed, Steven Miller attended at least six concerts and was in a position to inquire from the Orchestra members and the band leader about whether they were performing elsewhere or authorizing others to do so.

3. A draft pleading prepared by an attorney for Steven Miller, dated April 7, 1980, and entitled "Amended Petition for Removing Personal Representative" provides: "Prior to the death of Helen Miller, Mackay acquired one-half of the issued and outstanding stock of two corporations which own and operate the Glenn Miller Bands which have continued to play throughout the world since the death of Glenn Miller." *See Eisenberg Decl., Exh. 37(17).*

4. In 1992 and 1993, Jonnie and Steven Miller (respectively) became GMP shareholders. Each year thereafter, GMP sent Steven Miller financial information, including GMP's income statements. Some of the income statements were sent to Steven Miller directly; others were sent to his **\*943** attorney, Laura Ben-Porat of Gibson, Dunn & Crutcher. Each income statement contained line items for "Licensing U.S.," "Licensing U.K.," and "Licensing Europe." *See O'Reilly Decl., Exhs. A-O.* Steven Miller admitted receiving at least some of these financial statements. *See Eisenberg Decl., Miller Depo. (45-46, 53-54).* Counsel for Plaintiffs represented at the hearing that despite being shareholders, Steven and Jonnie Miller never attended a shareholder meeting or even spoke with David Mackay, Jr.

5. In 1994, the Millers hired the Roger Richman Agency to serve as their exclusive agent in obtaining licensees who would pay for the right to use Glenn Miller's name for commercial purposes, including on various products. Excluded from the products that the Agency was granted the rights to license, were the rights that GMP previously had granted to other third parties, such as "Orchestras of Glenn Miller Productions, Inc., a New York Corporation." *See Eisenberg Decl., Exh. 49(1).* In 1996, the Millers entered into a licensing agent agreement with Plaintiff CMG Worldwide, Inc. that contained the same exclusion. *Id., Exh. 50(1,7).*

Steven Miller argues that despite the evidence submitted by GMP, not until 2000 or 2001 did he learn that there was more

than one functioning Glenn Miller Orchestra. *See Miller Decl.* ¶ 9. (Steven Miller does not specify how he learned.) Steven Miller also claims that he did not learn until April 2003 (after filing this lawsuit), that GMP had entered into sub-licensing agreements with third parties to operate ensembles called "The Glenn Miller Orchestra."

The Court finds that Steven Miller's involvement in GMP matters, his status as a shareholder and his receipt of annual financial statements (some of which were sent directly to his attorney), were sufficient to give him constructive notice as early as 1980 and no later than the early-mid 1990s, that GMP was operating and/or sub-licensing more than one Glenn Miller Orchestra. Moreover, the licensing agent agreements and the Amended Petition, each of which explicitly refer to the existence of more than one Glenn Miller Orchestra, suggest that Steven Miller had actual knowledge long before filing suit. Because Plaintiffs offer no legitimate excuse (beyond their purported ignorance of GMP's activities) for their delay in filing suit, their delay was unreasonable.

### ii. *The Sale of Merchandise.*

GMP also contends that Plaintiffs knew or reasonably should have known that GMP was selling merchandise bearing the "Glenn Miller Orchestra" mark as early as 1983 and as late as the 1998. In support of its argument, GMP submits the following undisputed evidence, in addition to items 1 and 4 already discussed in the previous section:

1. Since the 1980s, Steven and Jonnie Miller have monitored unauthorized uses of the Glenn Miller name and have sent at least eight cease and desist letters to alleged infringers, including one living in South Africa. *See Eisenberg Decl., Exhs. 41-47; Miller Depo. (107-08, 125); Miller Decl., Exh. B.*

2. Since 1983, GMP has openly sold merchandise bearing the Glenn Miller Orchestra mark at performances. *See Mackay Decl.* ¶ 9. During these performances, an announcement is

made regarding the sale of merchandise, and a table displaying the merchandise**\*944** is set up in a prominent location. *Id.* Between the 1990s and the present, Steven Miller has attended approximately six Glenn Miller Orchestra performances. *See Eisenberg Decl., Miller Depo. (22-24).* Steven Miller admitted that he was aware that GMP was selling CDs at one of the performances. *Id. (142-144).*

3. Since September of 1998, GMP has sold Glenn Miller Orchestra merchandise on its website, *www.glennmillerorchestra.com. See Mackay Decl.* ¶¶ 9, 11.

Although Steven Miller contends that he did not gain actual knowledge of GMP's merchandising activities from the above-mentioned factors, the record does not indicate when and how he first discovered that GMP was selling objectionable merchandise.

The Court finds that the Millers' status as GMP shareholders, their involvement in GMP matters since 1979, Steven Miller's attendance at six Glenn Miller Orchestra performances since the early 1990s at which merchandise was advertised and sold in prominent locations, Steven Miller's admitted knowledge that GMP sold CDs at one such concert, and GMP's open and notorious sale of merchandise on its website were more than sufficient to give Plaintiffs constructive knowledge that during the 1980s and 1990s (and in any case, long before January of 1999), GMP was selling merchandise bearing the Glenn Miller Orchestra mark. Because Plaintiffs present no legitimate excuse (aside from ignorance), for their delay in filing suit, their delay was unreasonable.

### b. *Resulting Prejudice to GMP.*

In addition to establishing that Plaintiffs' delay in filing suit was unreasonable, GMP must also demonstrate that it has been prejudiced by the delay. A defendant may establish prejudice by showing that during the delay, it invested money to expand its business or entered into business transactions based

on his presumed rights. *See Whittaker Corp. v. Execuair Corp.,* 736 F.2d 1341, 1347 (9th Cir.1984); *Jackson v. Axton,* 25 F.3d 884, 890 (9th Cir.1994) (abrogated on other grounds, as recognized in *Jarrow Formulas,* 304 F.3d at 833-34); *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.,* 270 F.3d 298, 322 (6th Cir.2001) GMP may also prove prejudice if as a result of entering into such business transactions during the delay, it may incur liability for damages. *Id.* "[I]f only a short period of time has elapsed since the accrual of the claim, the magnitude of the prejudice require [d] before the suit should be barred is great, whereas if the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required." *See Hot Wax,* 191 F.3d at 824.

GMP contends that Plaintiffs' delay in filing suit has caused it prejudice because since the 1980s, GMP has invested a significant amount of time and money in developing its merchandising program, cultivating a market for GMP music, expanding its business through the operation of special Glenn Miller Orchestra units, and forming relationships with sub-licensees throughout the world. *See Mackay Decl.* ¶ 23. In addition, GMP contends that it will suffer a tremendous loss of goodwill among its existing licensees and clients if now forced to discontinue selling merchandise and operating or sub-licensing multiple Glenn Miller Orchestras. *Id.* Moreover, at the hearing on these motions, counsel for GMP represented, without refutation, that if GMP is forced to stop sub-licensing, it will be in breach of its existing sub-licensing agreements, and may thus incur liability for damages. Finally, at the hearing, counsel for Plaintiffs conceded that GMP has been prejudiced by the delay. GMP's showing of prejudice is sufficient to support**\*945** a defense of laches, especially in light of Plaintiffs' long delay in filing suit.

Because Plaintiffs' 5-23 year delay in filing suit was unreasonable and because GMP has been substantially prejudiced by the delay, all of Plaintiffs' claims are barred by laches.

. . . .

## CONCLUSION

For the foregoing reasons, the Court concludes that as a matter of contract law, in the 1956 agreement Helen Miller conveyed both a trademark license and a license to the right of publicity. It concludes that as a matter of trademark law, Helen Miller was in a position to convey a trademark license and that a jury could reasonably find facts establishing that she did. And it concludes that the sub-licensing rule applies to both such conveyances-*i.e.,* trademark and rights of publicity. However, despite having found that Plaintiffs have legal claims that the law could recognize, the Court nevertheless GRANTS IN WHOLE Defendant's motion for summary judgment [FN14] and dismisses the complaint because under the doctrines of laches, Plaintiffs waited too long to assert those claims. . . .

FN14. Docket number 19.

IT IS SO ORDERED.