**Bruce REMINGTON, Plaintiff,**

v.

**John MATHSON, Joy Mathson, et al., Defendants.**

No. 09–CV–4547 NJV

United States District Court,
N.D. California,
Eureka Division.

Signed March 27, 2012

Bruce Remington, Eureka, CA, pro se.

John Michael Vrieze, Paul A. Brisso, Russell Scott Gans, Mitchell Brisso Delaney & Vrieze, Eureka, CA, for Defendants.

## ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/PARTIAL SUMMARY JUDGMENT (Docket No. 63)

### NANDOR J. VADAS, UNITED STATES MAGISTRATE JUDGE

Pending before the Court is the Motion for Summary Judgment/Partial Summary Judgment filed by Defendants John and Joy Mathson. (Docket No. 63.) The Court has taken this motion under submission on the papers pursuant to Local Civil Rule 7–1(b). (Docket No. 76.) As set forth below, the Court grants Defendants' Motion for Summary Judgment as to the federal claims and declines to retain jurisdiction over the state law claims.

### BACKGROUND

This is a case between neighbors based in part on alleged violations of various federal environmental laws including the Resource Conservation and Recovery Act ("RCRA"), the Clean Water Act ("CWA"), the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), and Emergency Planning and Community Right to Know Act ("EPCRA"). Plaintiff raises the following eight claims in his Complaint: 1) CWA violation for discharges from five water point sources; 2) RCRA violation for discharge of hazardous wastes under 42 U.S.C. § 6972(a)(1)(A); 3) RCRA violation for handling, storage, treatment, transportation or disposal of solid or hazardous waste presenting an imminent and substantial danger to health or the environment under 42 U.S.C. § 6972(a)(1)(B); 4) CERCLA violation for discharging hazardous materials; 5) EPCRA violation for failing to report the release of hazardous substances; 6) trespass for dumping substances onto Plaintiff's property and the resulting discharge into Plaintiff's surface and groundwater; 7) nuisance resulting from Defendants' contamination of Plaintiff's property and construction of a fence partially on Plaintiff's property; and 8) negligence and negligence per se from Defendants' contamination of Plaintiff's property in violation of state and county codes and the CWA, failure to remove leaning trees near Plaintiff's property, and from Defendants' drainage pipes. (Docket No. 1) Plaintiff requests a declaration that Defendants violated the CWA, RCRA, CERCLA, and EPCRA. Plaintiff also requests that the Court order Defendants to clean up their property and Plaintiff's property; enjoin Defendants from storing, disposing, or discharging hazardous substances; order Defendants to comply with CERCLA and EPCRA reporting requirements; impose civil penalties for CWA and RCRA violations; and enjoin other conduct by Defendants.

## PROCEDURAL HISTORY

This action was filed on September 25, 2009. (Docket No. 1.) On November 30, 2009, Defendants filed a Motion to Dismiss or Stay Further Proceedings. (Docket No. 12.) Plaintiff opposed the motion. (Docket No. 20.) On March 26, 2010, the Court entered an order resolving the motion and providing in part as follows:

> The Court **DENIES IN PART** and **GRANTS IN PART** Defendants' motion to dismiss, and **STAYS** the state law claims of trespass, nuisance, negligence, and negligence per se raised in this federal action pending resolution of the quiet title, trespass, nuisance, nuisance per se, negligence, and negligence per se claims in the state court action, *Remington v. Mathson* (No. DR080678, Humboldt County Superior Court). The Court directs the parties to provide periodic updates to the Court, at least every 60 days, regarding the progress of the state court action and whether resolution has been reached on the quiet title, trespass, nuisance, nuisance per se, negligence, and/or negligence per se claims in the state court action. As noted above, Defendants referred to Rule 12(b)(6) grounds for dismissal, but did not present any argument on this basis. Defendants must file their answer to the complaint, or a Rule 12(b)(6) motion to dismiss on the federal environmental claims, within twenty (20) days of the filing of this order.

(Docket No. 36, p. 17–18.) Defendants filed an Answer to the Complaint on April 15, 2010.

On August 15, 2011, Defendants filed a Motion for a Protective Order and Exclusion Sanctions. (Docket No. 56.) Plaintiff opposed the motion. (Docket No. 59.) On September 13, 2011, Defendants filed the Motion for Summary Judgment/Partial Judgment now pending before the Court.

(Docket No. 63.) The Court took the Motion for a Protective Order and Exclusion Sanctions under submission on the papers and on September 27, 2012, entered an order granting the Motion. (Docket No. 72.) In that order, the Court found that Plaintiff had failed to comply with the expert witness disclosures required under Rule 26(a)(2), Federal Rules of Civil Procedure. *Id.* at 3:2–11. Accordingly, the Court ordered that Plaintiff would be "precluded from relying on retained expert witnesses to supply evidence on a motion, at a hearing, or at a trial in this case." *Id.* at 5:17. The Court ordered Plaintiff to produce "the March 2011 testing results" by close of business on September 30, 2011, and sanctioned Plaintiff in the amount of Defendants' costs and expenses in bringing the motion. *Id.* at 5:18–22. Defendants filed their bill of costs on October 6, 2011. (Docket No. 74.) The Court entered an order taxing costs and expenses in the amount of $2,525.00 on October 14, 2011. (Docket No. 75.) On October 28, 2011, Plaintiff filed a Motion for Leave to File a Motion for Reconsideration, which the Court denied on December 6, 2011. (Docket Nos. 83, 89.)

On October 17, 2011, the Court entered an order taking Defendants' Motion for Summary Judgment/Partial Judgment under submission on the papers pursuant to Civil Local Rule 7–1(b). (Docket No. 76.) Also on October 17, 2011, Plaintiff filed his opposition to Defendants' motion. (Docket No. 78.) Defendants filed objections to the Opposition the same day. (Docket No. 77.) Defendants filed their Reply to Plaintiff's Opposition on October 24, 2011. (Docket No. 81.) Plaintiff filed objections to Defendants' Reply on November 1, 2011. (Docket No. 88.)

Pursuant to the Court's order, Plaintiff filed a status report on March 16, 2012. (Docket No. 92.) In his status report,

Plaintiff states that Humboldt County conducted an investigation on Plaintiff's property in December of 2011. *Id.* at 1–2. Plaintiff attaches a copy of a report of testing done on his own property dated January 6, 2012. *Id.* at 6. He states that the state court trial has been continued to September 2012. *Id.* at 4.

Defendants filed a supplemental report on March 14, 2012. (Docket No. 91.) The supplemental report filed by Defendants provides in part as follows;

> In response to a new complaint lodged by Mr. Remington with the County of Humboldt Department of Public Health that the fill placed on the Mathsons' property constituted hazardous sold waste(s) in violation of hazardous waste laws and regulations, the Department of Public Health conducted an investigation. Trial in the State Court case was continued, by stipulation, pending completion of the investigation by the Department of Public Health.

> That investigation was recently completed on February 21, 2012, resulting in a finding that the fill placed on the Mathsons' property does not constitute solid waste, and the County found no violation of hazardous waste statutes or regulations. A copy of the relevant correspondence from the County of Humboldt, Department of Public Health, is attached as Exhibit A.

> As is self-evident from plaintiff's recent status report, the alleged "new" testing results he attached to his report are in no way tied to or in any way related to the Mathsons' property, and relate entirely to a reported investigation on plaintiff's property. Mr. Remington's speculative assertions that contamination allegedly found on his property originates from the Mathsons' property is not competent evidence and is not admissible evidence in either the state or federal proceedings. The "investigation" on the Mathsons' property to which Mr. Remington refers in his report has been completed, and no further action was deemed warranted as the County of Humboldt notes. With the County investigation complete, trial has been reset in the state court case for September 10, 2012, regarding the parties' respective nuisance and trespass claims against each other.

*Id.* at 1:19–2:14.

## LEGAL STANDARDS

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). Under summary judgment practice, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 987 (9th Cir.2006). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Miller*, 454 F.3d at 987.

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553; *Fortyune v. American Multi–Cinema, Inc.*, 364 F.3d 1075, 1080 (9th Cir. 2004). Indeed, summary judgment should be entered "after adequate time for discovery and upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552; *Miller*, 454 F.3d at 987. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. at 2552.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to a material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir.2000). The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir.2008) (quoting Fed. R. Civ. Pro. 56(e)); *Miller*, 454 F.3d at 987. The op-

posing party must demonstrate that the fact in contention is material, *i.e.,* a fact that might affect the outcome of the suit under the governing law, *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Cline v. Industrial Maintenance Engineering & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir.2000), and that the dispute is genuine, *i.e.,* the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510; *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1144 (9th Cir.2006). A "mere scintilla of evidence" supporting the non-moving party's position is insufficient to defeat a motion for summary judgment. *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir.2007); *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir.2005). In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 872 (9th Cir.2007). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) Advisory Committee Note to 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *Poller*, 368 U.S. at 468, 82 S.Ct. at 488; *Price v. Sery*, 513 F.3d 962, 965 n. 1 (9th Cir.2008); *Lockett v. Catalina Channel Exp., Inc.*, 496 F.3d

1061, 1064 (9th Cir.2007). "[I]n ruling on a motion for summary judgment, the non-moving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 1551–52, 143 L.Ed.2d 731 (1999) (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505); *Miller*, 454 F.3d at 987; *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir.2003). Finally, to demonstrate a genuine issue the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (citations omitted).

## PLAINTIFF'S DECLARATION

Accompanying Plaintiff's Opposition to Defendants' Motion for Summary Judgment/Partial Summary Judgment is a two-volume Declaration of Bruce Remington ("Remington Declaration"). (Docket Nos. 79, 80.) The Remington Declaration is comprised of text, photographs and what appear to be copies of other documents. The photographs and apparent copies of documents are dispersed between the text pages. The text portion of the Remington Declaration is numbered through page 157 and the Court estimates that the non-text portion comprises approximately 100 pages.

Defendants object to the Remington Declaration on the grounds that it does not comply with either Rule 56 of the Federal Rules of Civil Procedure or Civil Local Rule 70–5. Defendants therefore ask the Court to strike the Remington Declaration.

Rule 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Civil Local Rule 7–5(b) provides as follows:

> (b) Form. An affidavit or declaration may contain only facts, must conform as much as possible to the requirements of Fed. R. Civ. P. 56(e), and must avoid conclusions and argument. Any statement made upon information or belief must specify the basis therefor. An affidavit or declaration not in compliance with this rule may be stricken in whole or in part.

The Court finds that, as Defendants argue, the Remington Declaration is replete with inadmissible hearsay which cannot be considered by this Court. This includes Plaintiff's descriptions conversations he had with various County and State officials and findings allegedly made by them. The Court also finds that the Remington Declaration contains many speculative opinions and factual assertions that lack foundation. Further, the Court finds that Defendants are correct in arguing that there is no foundation to support Plaintiff's assertion that he constitutes an "expert" in the matters he proclaims. Plaintiff's statement that he is "an expert on, without limitation, the pollution, contamination, and wastes disposed by Mathson on my property, the hydrology and topography of these sites, the volume and location of the various solid and hazardous wastes on this site (especially asbestos pipe), proper scientific sampling and testing procedures, the composition of many of Mathson's wastes dumped on my land discovered to date, the general biology of the sites, the statistically estimated weight of asbestos pipe and friable matting deposited here, and many of the state and federal laws violated thereby," does not make him such. The Court finds

no foundational basis to consider Plaintiff an expert on any matter.

Defendants contend that none of the material cited to in the Remington Declaration is presented in a form that would be admissible evidence, and thus object to it pursuant to Rule 56(c)(2). Defendants note in particular Plaintiff's citation to environmental tests, arguing that these are inadmissible and that Plaintiff lacks qualification to render an opinion regarding them. Defendants also cite Plaintiff's attachment of multiple copies of pages from "Wikipedia" and other websites in support of his assertions, arguing that all of this material is inadmissible and should be stricken. Finally, Defendants argue that the Declaration should be stricken under Civil Local Rule 7-5(b) as it is replete with argument and irrelevant statements and factual assertions made are not supported by admissible evidence.

The Court finds all of Defendants' arguments to be well-taken, and finds that it would be within its discretion to strike the entire Remington Declaration. However, in the interests of judicial economy and in light of the strong public interest in the speedy resolution of this case on the merits, the Court declines to do so. The Court will, however, consider the admissibility of the *evidence* cited by Plaintiff as it considers each of his arguments in opposition to the pending motion.

## UNDISPUTED FACTS

1. John and Joy Mathson own the real property located at 778 Westgate Drive and have resided at the property since 1971.

2. Bruce and Suzanne Remington own the real property adjacent to the Mathsons' property and located at 832 Westgate Drive. The Remingtons have owned the real property since 1979.

3. At the outset of this dispute between neighboring real property owners, Remington alleged and asserted that he had the right to maintain certain encroaching structures (i.e., a "fence" and other miscellaneous items) on a portion of the real property the Mathsons' assert belongs to them.

Defendants cite as evidence in support of this fact Request for Judicial Notice ("RJN") Exhibit E, which they describe the "Remington Verified Complaint filed in Humboldt Superior Court, DR080678 on July 21, 2008." Plaintiff disputes only the assertion that this complaint was verified, claiming that it was not. The Court finds the stated fact undisputed for the purposes of the motion.

4. During the course of simultaneously filed litigation in the Humboldt County Superior Court, Michael Pulley of Points West Surveying has been retained by the Mathsons to locate the true boundary line between the Mathson and Remington parcels.

Although Plaintiff responded to this fact offered by Defendants by stating that it is partially disputed, the Court finds that none of Plaintiff's comments dispute the stated fact. The Court finds the stated fact undisputed for the purposes of the motion.

5. As a result of Mr. Pulley's survey work on or about December 15, 2010, he has located the true boundary between the Mathson and Remington parcels and has prepared a formal survey documenting said property line.

Although Plaintiff responds to this fact offered by Defendants by stating that it is partially disputed, Plaintiff states that he now recognizes the Pulley line as the "legal boundary." The Court finds the fact as stated is undisputed for the purposes of the motion.

6. During calendar year 1998, John and Joy Mathson built a detached garage and placed fill in their backyard for purposes of landscaping improvements.

Defendants cite RJN Exhibit F, Mathson Declaration at paragraph 3, in support of this fact. This Declaration by John Mathson is made under penalty of perjury. *Id.* at 5. At paragraph 3, Mr. Mathson states, "[d]uring calendar year 1998, my wife and I sought to construct a detached garage and add fill to our backyard for the purpose of landscaping improvements." Defendants also cite the RJN Exhibit F, Declaration of Kyle Skillings ("Skillings Dec.") at paragraph 2. This Declaration is also made under penalty of perjury. *Id.* at 2. At paragraph 2, Mr. Skillings states in part, "[d]uring the calendar year 1998, I operated a large, rubber tired loader on the Mathsons' property, and spread the fill materials used for their garage construction project and backyard landscaping."

Plaintiff responds to this fact asserted by Defendants by stating that the fact is probably undisputed, "unless at trial it develops that the Mathsons were paid by the truckers to dump their hazardous wastes locally and then have Mathson and Skillings conceal the solid wastes from the authorities." Plaintiff cites no evidence to support the possibility of such a showing at trial, and the Court finds the fact as asserted by Defendants to be undisputed for the purposes of the motion.

7. All fill was placed in the Mathsons' backyard in calendar year 1998. The majority of the fill, as conclusively determined by December 2010 survey evidence, is located on the Mathson parcel.

Defendants cite RJN Exhibit F, the Mathson Declaration at ¶ 4, in support of this asserted fact. In paragraph 4, John

Mathson states in part, "[a]ll fill was placed in our backyard in calendar year 1998." Defendants also cite RJN Exhibit E, Skillings Dec., at ¶ 2.[1] This paragraph is quoted directly above in reference to undisputed fact number 6.

Although Plaintiff states that he disputes this fact, he states that the majority of the fill is located on the Mathsons' land, according to his own estimates. He states specifically that "about 80%" of the fill is on the Mathsons' land. Further, Plaintiff does not dispute that "the December 2010 survey evidence" shows anything other than what Defendants assert it does. Plaintiff merely asserts that the survey evidence is incorrect. The Court therefore finds the fact as asserted by Defendants is undisputed for the purposes of the motion.

8. The Court finds that this asserted fact is disputed.

9. On or about June 16, 2010, Scott Ferriman of Blue Rock Environmental drilled five (5) solid borings on portions of the Mathson property, all within the subject "fill" in close proximity to the portions of the fill on the side of the "fence" Mr. Remington constructed. The purpose of the borings was to obtain analytical testing of the soil components, and specifically to assess whether any "pollutants" or "contaminants" exist in the fill which pose any threat to human health or safety, or to the environment.

In support of this asserted fact, Defendants cite the Declaration of Scott Ferriman ("Ferriman Declaration.") at ¶ 2, in which Ferriman asserts precisely what is stated in this undisputed fact. Although Plaintiff indicates that this fact is partially disputed, Plaintiff simply criticizes the location of Ferriman's testing and assumptions which he claims Ferriman made.

---

1. Defendants repeatedly mistakenly refer to the Skillings Declaration as Exhibit E to the Request for Judicial Notice. It is actually Exhibit G.

The Court finds that this does not establish a dispute as to the fact asserted by Defendants, and that this fact is undisputed for the purposes of the motion.

10. Mr. Ferriman and Mr. Gwinn of Blue Rock Environmental were aware that the fill contained chunks of hardened asphalt and concrete.

11. Since hardened asphalt can show up as a "false positive" during analytical testing, leachability testing was performed on all five soil borings taken by Blue Rock Environmental to determine if any pollutants "leached" or migrated from the soil samples collected from the borings into surface water or ground water.

In support of this asserted fact, Defendants cite the Ferriman Declaration at ¶ 4, which provides as follows:

4. Knowing the hardened asphalt and concrete chunks existed in the fill on the Mathson's property, Brian Gwinn of Blue Rock Environmental and I sought to subject the soil samples on three of the five soil borings to "leachability testing" to determine if any pollutants "leached" or migrated from the hardened asphalt into adjacent ground or surface water. Leachability testing is a typical study method in connection with site evaluations by the Northern California Regional Water Quality Control Board. Basically, hardened asphalt can show up as a "false positive" during analytical testing, due to the presence of oil based products in the asphalt for cohesion. In circumstances where hardened asphalt is known to exist, leachability testing is conducted to determine if any hydrocarbons "leach" or "migrate" into surface or groundwater.

Defendants also cite the Gwinn Declaration at ¶ 14, wherein he states:

14. Additionally, the fill samples with the highest TPHmo and TPHd concentrations were selected for leachability testing to evaluate the potential for those compounds to leach into groundwater. Fill samples SB–2–Fill and SB–4–Fill were subjected to a Waste Extraction Test (WET) in which deionized water was used as the extractant. Calscience Environmental Labs performed the WET extraction on the soil samples and Kiff analyzed the extracts for:

- TPHmo (w/silica-gel clean-up) by EPA Method 8015M
- TPHd (w/silica-gel clean-up) by EPA Method 8015M

Plaintiff disputes this asserted fact, arguing first that, "[a]sphalt does NOT cause a 'false positive,' and pretend to be diesel SINCE ASPHALT HAS NO DIESEL MOLECULES." Defendants do not claim to the contrary in the asserted fact set forth above. Second, Plaintiff argues that Defendants have no evidence that the asphalt is not leaching. The Defendants' possession of such evidence is not addressed in the asserted fact in question. Third, Plaintiff asserts that Blue Rock did the wrong EPA leaching test for soils containing motor oil. The correctness of a particular EPA leaching test is not addressed in the asserted fact in question. The Court therefore finds the asserted fact to be undisputed for the purposes of the motion.

12. The leachability test results demonstrated that "absolutely" no hydrocarbons, gasoline or other pollutants claimed to exists by Mr. Remington "leached" or otherwise migrated from the fill, and demonstrated that no contaminants leached into water. All soil borings taken from the Mathsons' property were either "non-detect" for these substances or where minor

elevations were noted they tested "non-detect" when subjected to extraction/leachability tests.

In support of this asserted undisputed fact Defendants cite the Ferriman Declaration at ¶ 5, and the Gwinn Declaration at ¶ 12. Ferriman states as follows at paragraph 5 of his Declaration:

5. The leachability test results from the Mathson property demonstrated that absolutely no hydrocarbons "leached" or otherwise migrated from the fill. Basically, all water and leachability testing results were "clean", showing no contaminants (hydrocarbons, gasoline or other pollutants claimed to exist by Mr. Remington) leached into water. The data from these testing results is recited in the Declaration of Brian Gwinn, filed in [sic] simultaneously in support of this motion.

At paragraph 12 of his Declaration, Gwinn states as follows: "12. Drill-rod, hand augers, and sampling devices were cleaned in an Alconox (R) wash followed by double rinse in clean tap water to prevent cross-contamination."

Plaintiff disputes this asserted fact, arguing that Blue Rock did the wrong EPA test, and complaining about how the testing was done. The Court finds that the asserted fact addresses only the results of the testing that was done and does not address the choice or method of testing. The Court thus finds that the asserted fact is undisputed for the purposes of the motion.

13. Blue Rock Environmental conducted water testing on the two six inch (6″) pipes that exist beneath a substantial portion of the fill on the Mathsons' property and are asserted in Mr. Remington's complaint as a principal point source of contamination.

The pipes are perforated, approximately sixty feet in length, and are placed directly under (and drain groundwater located in) substantial portions of the fill on the Mathson's property.[2]

Defendants provide several citations in support of this asserted fact, the first being the Ferriman Declaration at paragraph 6.

6. Additionally, we conducted water testing on the two six inch pipes that exists beneath a substantial portion of the "fill" on the Mathson's [sic] property and are asserted in Mr. Remington's complaint in this lawsuit and his "Notice of Intent to Sue" as a primary "point source" of pollution. These pipes, I am informed, are all perforated and are in excess of forty feet in length, with fill materials directly above them. Simply put, one would be hard pressed to design a better "test case" to determine if contaminants leached through soil, into groundwater. The results from the water samples from the pipe outfall were "non-detect", [sic] meaning they did not reveal any hydrocarbons, gasoline or other pollutants. The water samples were tested for motor oil, diesel, gasoline, gasoline constituents, MTBE and heavy metals associated with these hydrocarbons, and the testing results revealed absolutely no contaminants which present any threat to human health or safety.

Defendants cite the Gwinn Declaration at ¶ 15, wherein Gwinn states as follows:

15. Also on June 16, 2010, Blue Rock scientist Scott Ferriman, working to implement Blue Rock's pre-determined testing plan, collected a

2. These pipes are elsewhere referred to as "French drains."

water sample from the fill drainage pipe outfall as depicted in Exhibit C [labeled "Figure 2"]. A water sample was collected from the lines draining the fill to evaluate if that material was sourcing any hydrocarbons or metals to groundwater. The outfall was sampled because no groundwater was encountered in any of the borings, and the water emanating from the base of the fill is believed to be highly representative of groundwater in contact with the fill, as detailed further in the accompanying Declaration of Scott Ferriman. Moreover, as identified in Mr. Remington's "Notice of Intent to Sue" issued prior to filing this case, the twin outfall pipes are identified as the primary "point source" of pollution, according to him. The water flowing from the pipes was collected directly into laboratory supplied containers. The sample containers were then capped, labeled, documented on a chain-of-custody form, and placed on ice in a cooler for transport to the project laboratory.

Defendants also cite RJN, Exhibit H, which is a Notice of Intent to Sue by Plaintiff, addressed to Defendants and dated May 27, 2009. The Notice of Intent to Sue contains the following language:

Additionally, a substantial amount of water from the Mathson's "toxic dump" permeates down thru the DEEP layers of contaminated fill in their own back yard and then flow directly into their large French drain system which the Mathsons have protecting their entire property from further slides. These French drains are 10–20' deep and flow steeply downhill to their terminus which are *TWO 6″ drain pipes,* which flow at high volume and velocity under certain conditions directly *onto and into* plain-

tiff's soft property, a mere six (6) feet from the present fence line separating the properties. Mathson is aware but unconcerned that nearly all of their contaminated run-off flows into plaintiff's surface and subsurface water, either through said TWIN 6″ pipes or directly by other routes into plaintiff's 20' deep ravine and "creek", [sic] and ultimately into all the waterways of the State of California and United States.

Notice of Intent to Sue, p. 4. Under the heading, "*C.W.A. Violations,*" Plaintiff states in part, "[o]bviously, the above-referenced TWIN 6" diameter drain pipes from beneath Mathson's entire property also constitute "point sources". [Sic.] *Id.* at p. 6. Under the same heading, Plaintiff also states:

Mathson has two 6″ drain pipes which drain subterranean pollutants from his property directly onto and into Remington's land, polluting his groundwater, surface water, creek, Elk River and its wetlands and thereafter Humboldt Bay and the Pacific Ocean. As stated above, Mathson's two 6″ drain pipes constitute "point sources" under CWA.

*Id.* at p. 7. Finally, Defendants cite the Mathson Declaration at ¶1, wherein Mr. Mathson states, "[w]hen the fill was placed in 1998, we placed two (2) sixty foot (60') lengths (more or less) of six inch (6″) perforated pipe beneath the fill in order to drain it."

Plaintiff disputes this fact, asserting first that the six inch pipes are solid and unperforated. In support of this assertion, Plaintiff cites the Remington Declaration at page 43. The Court has examined page 43 of the Remington Declaration and finds no reference to whether the six inch pipes in question are perforated.

Second, Plaintiff asserts that the six inch pipes are not a principal point source in his

Complaint, again citing page 43 of his Declaration. The Court finds that the contents of page 43 of the Remington Declaration is irrelevant to whether the six inch pipes are identified in Plaintiff's Complaint as a principal "point source" of the contamination.

Third, Plaintiff states that the pipes in question are 95 feet long, citing the Remington Declaration at pages 42–3, and pages 13, 69 and 70. These pages provide no reference to the length of the pipes in question.

The Court finds the asserted fact to be undisputed for the purposes of the motion.

14. From a scientific standpoint, the six inch (6″) perforated drain pipes constitute an excellent "test case" to determine if contaminants leach through soil, into groundwater.

Defendants cite the Ferriman Declaration at ¶ 6, quoted above. Defendants also cite the Gwinn Declaration at ¶ 15. Under the heading, "Fill Drainage Pipe Outfall Sampling and Analysis," paragraph 15 provides as follows:

15. Also on June 16, 2010, Blue Rock scientist Scott Ferriman, working to implement Blue Rock's pre-determined testing plan, collected a water sample from the fill drainage pipe out fall as depicted in Exhibit C [labeled "Figure 2"]. A water sample was collected from the lines draining the fill to evaluate if that material was sourcing any hydrocarbons or metals to groundwater. The outfall was sampled because no groundwater was encounter in any of the borings, and the water emanating from the base of the fill is believed to be highly representative of groundwater in contact with the fill, as detailed further in the accompanying Declaration of Scott Ferriman. Moreover, as identified in Mr. Remington's "Notice of Intent to Sue" issued prior to filing this case, the twin outfall pipes are identified as the primary "point source" of pollution, according to him. The water flowing from the pipes was collected directly into laboratory supplied containers. The sample containers were then capped, labeled, documented on a chain-of-custody form, and place on ice in a cooler for transport to the project laboratory.

Plaintiff disputes this asserted fact, claiming first that the pipes are irrelevant to the case. The Court rejects this argument as meritless, based on Plaintiff's reliance on the pipes as point sources of pollution in both his Notice of Intent to Sue and his Complaint. See, e.g. page 22 of Complaint. Plaintiff claims second that the pipes are 50 to 150 feet from the contamination complained of on his property. The Court finds that this assertion does not establish a dispute as to the asserted fact.

Third, Plaintiff claims that "Blue Rock is WRONG (again) and perpetrating a fraud on this Court." Plaintiff claims that he can prove this fraud with physical evidence at trial or a hearing. Plaintiff cites page 67 C of his Declaration, in which he repeats his assertion that the pipes are not perforated. Plaintiff states that his next course of action is to bring a section of "that pipe" to Court.

As stated above, the Court finds that a dispute exists as to whether the pipe in question is perforated. The Court finds that Plaintiff has not addressed the remainder of the asserted fact and finds it to be undisputed for the purposes of the motion.

15. The results from the water samples from the pipe outfall on the Mathson's property were "non-detect", meaning they did not reveal any motor oil, diesel, gasoline, gasoline constitutes or heavy metals, and the testing results revealed absolutely

non contaminants which present any threat to human health or safety.

Defendants cite the Ferriman Declaration at ¶ 6, quoted above in regard to undisputed fact number 13. Defendants also cite the Gwinn Declaration at ¶ 28, wherein Mr. Gwinn states as follows regarding his investigation of the fill proximal to the property line [emphasis added]:

28. Laboratory analysis of the fill material detected hydrocarbons in the range of TPHmo, and to a lesser degree TPHd. The TPHd results were generally flagged by the laboratory with a note that the hydrocarbons present were higher-boiling than typical diesel fuel. Based on that note and the observed asphalt pieces in the fill, the presence of heavier end hydrocarbons in the samples is interpreted to likely be the result of the asphalt itself. The leachability testing indicates that the hydrocarbons quantified as TPHmo and TPHd is [sic] the fill do not have the potential to leach into the groundwater. Further, the water sample collected directly from the fill drainage outfall pipe did not contain detectable concentrations of TPHmo, TPHg, BTEX, or MTBE. *Simply put, none of the testing conducted on the Mathson's [sic] property or any area to which they are known to have access to for over [sic] past 13 years reveals the existence of any hazardous material or pollutant which "leaches", "migrates" or in any way pollutes or contaminates groundwater or surface water. Nothing detected in these environmental studies would trigger any regulatory response or remediation requirement from any known governmental entity.* To the extent "hydrocarbons" were detected, the leachability testing indicates they exist in the form of hardened, inert, asphalt concrete, which presents no environmental threat.

Plaintiff disputes this asserted fact, criticizing the methods by which the testing was performed. The Court finds that this criticism does not create a genuine dispute to the fact as asserted by Defendants. The Court finds the fact as stated to be undisputed for the purposes of the motion.

16. Hardened chunks of asphalt and concrete present no more danger to the environment than the public streets and highways we drive on.

Defendants cite the Ferriman Declaration at ¶ 3 in support of this asserted fact, wherein Mr. Ferriman states as follows:

3. Based on pre-soil boring visual inspections and site visits, I was aware that the fill contained some chunks of hardened asphalt and concrete. Hardened asphalt and concrete chunks is [sic] a common "fill" material. For example, asphalt is a permitted fill material in the State of California and is readily sold as compactable fill material for construction projects. Simply put, hardened asphalt and concrete chunks are no different than hardened asphalt and concrete on public roads and highways, and this material presents no "migration" concerns.

Plaintiff states that he disputes this fact, but does not address the fact as stated. The Court finds the stated fact undisputed for the purposes of the motion.

17. Despite Mr. Remington's allegations to the contrary, no point source of water pollution has been located on the Mathsons' land prior to the close of discovery in this proceeding, or after the close of discovery.

Defendants cite the Ferriman Declaration at ¶ 6 and the Gwinn Declaration at ¶ 15 in support of this asserted fact. Both of these paragraphs are quoted above in

connection with undisputed fact number 13.

Plaintiff disputes this asserted fact, but states, "[n]o point sources have been sought on M's private property." The Court finds the fact as asserted undisputed for the purposes of the motion.

18. Despite Mr. Remington's allegations to the contrary, no water samples taken from any location on the Mathsons' property prior to the close of discovery in this proceeding, or after, and analyzed by a competent and certified laboratory, has revealed the presence of any diesel, gasoline, MTBE or BTEX, lead, any heavy metals, or any other pollutants or hazardous materials which leaches, migrates or in any way infiltrates ground or surface water.

Defendants cite the Ferriman Declaration at ¶ 6 in support of this asserted fact, which is quoted above in reference to undisputed fact number 13. Defendants also cite the Gwinn Declaration at ¶ 29, at which Mr. Gwinn states:

> 29. Despite Mr. Remington's claims in this lawsuit to the contrary regarding the presence of "heavy metals", testing on the fill and soil samples for the presence of metals revealed concentrations consistent with native background levels in the Eureka area. The water samples collected from the fill drainage pipe outfall did not contain any metals in detectable concentrations, except for boron at 0.30 ug/L (which is well below its Maximum Contaminant Level for drinking water of 1.6 ug/L).

Plaintiff states that he disputes this fact, but offers no argument which directly addresses the fact as stated. The Court finds this fact as stated undisputed for the purposes of this motion.

19. Despite Mr. Remington's allegations to the contrary in this case, at no time has he produced any scientifically competent evidence of any soil borings containing lead or heavy metals at any location, be it on his or the Mathsons' property.

Defendants cite the Ferriman Declaration at ¶ 8 in which he states as follows:

> 8. Of note, no toxicity tests were performed by Mr. Aveggio or SHN, and he references none in his declaration. All heavy metals including lead tested by Blue Rock Environmental were at background levels for this geographic area. SHN did not test for heavy metals. Since all visual evidence indicated that the only "hydrocarbons" contained in the fill placed on the Mathson's property came in the form of inert, hardened asphalt concrete, Blue Rock Environmental caused waste extraction tests to be performed, and those tests clearly indicate that the motor oil and diesel concentrations in soil [sic] do not leach and therefore do not pose a threat to the environment and human health. The laboratory chromatograms for the motor oil and diesel samples are not similar to motor oil or diesel and are heavier hydrocarbons similar to asphalt. True and correct copies of the chromatograms are appended to the Declaration of Brian Gwinn, filed herewith.

Defendants also cite the Gwinn Declaration at ¶ 29, which is quoted above in reference to undisputed fact number 18.

Plaintiff disputes this asserted fact, but does state expressly that he never conducted borings on Defendants' land. Plaintiff does not address the issue of borings on his land. The Court finds this fact as stated undisputed for the purposes of the motion.

20. The Court finds this asserted fact to be disputed.

21. "No 'pollutant' or 'hazardous substance' as defined under state or federal law has been located on any portion of the

Mathson's [sic] Property which presents any imminent threat to human health, safety or the environment."

Defendants cite the Ferriman Declaration at paragraph 8, which is cited above in reference to undisputed fact number 19, and at paragraph 9, which is cited directly above. They also cite the Gwinn Declaration at paragraph 28, cited in reference to undisputed fact number 15, and at paragraph 30, which provides as follows:

> 30. Based on the results of the investigation, Blue Rock sees no basis or support for Mr. Remington's claims, and no corrective action related to the fill material is warranted under any state or federal laws governing any of the pollutants Mr. Remington claims to exist in this case.

Finally, Defendants cite the Schwarz Declaration at paragraph 8, which provides as follows:

> 8. As stated above, only several pieces of cement piping were observed, but it is unknown if one of these was the one sampled by Mr. Remington. In their current state the pipe fragments present no imminent threat to human health or safety, or the environment. Since the material is not friable, and assuming no further disturbance, release of airborne asbestos fibers from the cement piping would be very unlikely. Asbestos is a mineral, does not "leach" and thus does not present a "contamination" hazard to soil or groundwater. If the few pieces of surficial [sic] pipe are collected they should be put in proper six mil bag [sic] (provided by HWMA) and taken to HWMA's site in Eureka.

Plaintiff disputes this asserted fact, arguing that he found and tested "two asbestos samples" "located on R's side of fence on M's land." He argues that this asbestos may pose an imminent threat. The Court has found these alleged asbestos

tests of 2010 inadmissible. Further, no claim regarding asbestos is contained in the Complaint, thus Plaintiff's claim regarding asbestos is irrelevant. The Court finds that the fact as stated is undisputed for the purposes of the motion.

22. "During the course of all scientific testing performed by Blue Rock Environmental, they and their certified laboratory, Kiff Analytical in Davis, California, followed all regulatory and industry requirements for chain of custody and sample testing protocol."

Defendants cite the Ferriman Declaration at paragraph 10, which provides as follows;

> 10. Blue Rock Environmental observed all laws applicable, including compliance with pre-investigation permitting requirements, in connection with procuring the testing results discussed in this Declaration. We followed all industry required chain of custody protocols, and our samples were sent to Kiff Analytical in Davis, California for analysis. Kiff Analytical is a California and National certified laboratory. Although summarized in this declaration and the accompanying Declaration of Brian Gwinn and technical in content, attached to the Gwinn Declaration are true and correct copies of the soil sample and water sample testing results procured by Blue Rock Environmental from Kiff Analytical. All of those samples were obtained during the regular course of our work as summarized in this Declaration and that of Brian Gwinn's, and submitted to Kiff in accord with industry standards and protocol.

Defendants also cite the Gwinn Declaration at paragraphs 8 through 14. Paragraph 12 is quoted in reference to the twelfth undisputed fact, and paragraph 14 is quoted in reference to the eleventh un-

disputed fact. Paragraphs 8 through 11 provide as follows:

8. On June 16, 2010, Blue Rock scientist Scott Ferriman, working to implement Blue Rock's pre-determined testing plan, supervised all drilling and sample activities. Drilling permits were obtained from the Humboldt County Division of Environmental Health (HCDEH) prior to commencement of field activities.

9. Borings SB–1 through SB–5 were advanced using a hand auger equipped with a three-inch diameter auger. The borings were advanced to depths ranging between 4 and 7 feet below ground surface (ft.bgs). Portions of each soil sample were retained for a visual description by a Blue Rock scientist using the Unified Soil Classification System, and for volatile organic headspace analysis using a photo-ionizing organic vapor meter (OVM).

10. The fill-native soil contact was observed in three borings at depths ranging from 3.5 to 5 ft bgs, while fill was observed in the other two borings to depths of 4 and 7 ft bgs at which point auger refusal occurred. No groundwater was encountered in any of the borings.

11. A total of seven soil samples were collected for laboratory analysis: four samples consisted of fill material and three samples consisted of native soil. These samples were collected into either brass tubes of 4 oz. glass jars. The sample containers were then capped with the appropriate lid (i.e. teflon lined plastic caps for brass tubes and screw-on lid for glass jars), labeled, documented on a chain-of-custody form, and placed on ice in a cooler for transport to the project laboratory.

Paragraph 13 provides as follows:

The soil samples were transported to Kiff Analytical LLC (Kiff), a DHS-certified laboratory located in Davis, California, for analysis of:

- Total petroleum Hydrocarbons as Motor Oil (TPHmo) by EPA Method 8015M (w/silicagel clean-up)

- TPH as Diesel (TPHd) by EPA Method 8015M (w/ silica-gel clean-up)

- TPH as Gasoline (TPHg) by EPA Method 8260B

- Benzene, Toluene, Ethylbenzene, Xylenes (BTEX) by EPA Method 8260B

- Methyl tert-butyl ether (MTBE) by EPA Method 8260B

- Cadmium, Chromium, Nickel, Lead, Zinc, and Boron (Cd, Cr, Pb, Zn, B) by EPA Method 6010B

Plaintiff disputes this asserted fact claiming that, "Kiff VIOLATED many protocols, ignored here by M, in their subbing-out work to *CalScience* Environmental Labs, without proper details, explanations and protocols," citing his own Declaration wherein he relies on the Declaration of John Aveggio, and on his own opinion. Plaintiff's reliance on the opinion of Mr. Aveggio is in violation of this Court's order of September 27, 2012, and Plaintiff has not been deemed an expert in these matters. The Court thus finds that Plaintiff has produced no admissible, competent evidence in support of his claim. The Court therefore finds this stated fact undisputed for the purposes of the motion.

23. The Court finds this fact offered by Defendants to be disputed.

24. Mr. Remington reportedly "self-collected" and unearthed some miscellaneous cement pipe fragments in the area of the fill at or near the property line (as surveyed).

Defendants cite the Schwartz Declaration at paragraphs 3, 5 and 6, which provided as follows:

3. I have reviewed photographs of the reported cement pipe fragments produced by the parties in this litigation, I have reviewed the alleged Western Analytical testing report Mr. Remington reportedly self-procured, I have reviewed survey mapping prepared by licensed surveyor Michael Pulley, I have reviewed a fill isopach map prepared by Brian Gwinn of Blue Rock Environmental documenting the fill footprint and area (which I understand is being filed herewith) and I have viewed the site from the Mathson's [sic] real property, on their side of the surveyed property line in proximity to Mr. Remington's "fence."

5. I reviewed the Blue Rock Environmental report, primarily to understand the alleged fill location on the Remington property. Photographs (electronic) were provided capture [sic] the allege [sic] fill on the Remington property. The dates of the photographs reviewed were December, 2010 and July 6, 2011. The pictures capture what appear to be cement piping on the surface of the alleged fill on the Remington property. At least one piece appears to be newly broken. As noted, also reviewed was the Western Analytical Laboratory, Inc.'s Test Report data dated July 14, 2010. The reference site is 832 Westgate Drive and the client was identified as "Mr. Bruce Remington." The report indicates that a pipe fragment and sheeting fragment were tested by polarized light microscopy for asbestos content. The pipe fragment had 10% chrysotile and 15% crocidolite. The sheeting fragment had 60% chrysotile. The pipe fragment is report to be "non-friable."

6. Based on the "pipe fragment" allegedly sampled by Mr. Remington, it is alleged that the slight fill area on the Remington property contains pipe fragments that contain asbestos. No chain of custody was provided with Mr. Remington's report, and no independent testing was conducted by a certified individual. Due to the lack of chain of custody and sampling being procured by a non-certified individual I harbor strong reservations about the reliability of the report. The pipe fragment was deemed "non friable" by the lab and based on photos and site observation that [sic] the pipe still appears to be in a non friable state.

Plaintiff disputes this asserted fact, claiming that, "John Aveggio, a principal of SHN discovered and sampled the asbestos located off the path, next to the fence, on land now recognized as M's land." Plaintiff states that, "All R did was mail them to Western Analytical Labs, as suggested by Mr. Aveggio." The Court finds that the fact as stated is undisputed for the purposes of this motion.

25. The cement pipe fragments, which are alleged to contain asbestos, were deemed non-friable and present no significant threat to human health or safety.

Defendants cite the Schwartz Declaration at paragraphs 6–8. Paragraph 6 is quoted above in reference to undisputed fact no. 24. Paragraph 7 provides as follows:

7. Title 22, section 66261.24 (Characteristic of Toxicity) of the California Code of Regulations considers asbestos to be a hazardous waste if the material contains more than 1% asbestos and "In the case of asbestos and elemental metal, the specified concentration limits apply only if the substances are in a friable, powdered or finely divided state." The pipe fragments on the alleged fill near the property line are not in a "fria-

ble, powdered or finely divided state" and are thus not a hazardous waste in California. Materials containing more that 1% of asbestos and are not friable [sic] are considered a non friable non hazardous asbestos waste. These materials are accepted by the Humboldt Waste Management Authority (HWMA) in Eureka, California.

Paragraph 8 is quoted above in reference to undisputed fact no. 21.

Plaintiff disputes this fact, arguing that the pipes in question are "asbestos pipes, not cement pipes, that the pipes are both friable and non-friable, and that the pipes are a "potential threat." The Court finds that Plaintiff has produced no competent evidence to support his claims and that the fact as stated is undisputed for the purposes of the present motion.

26. At no time prior to filing his complaint in this action or in preparing his Notice of Intent to Sue in anticipation thereof did Mr. Remington allege the existence of any hazardous wastes in the form of asbestos.

Plaintiff does not dispute this asserted fact. The Court finds this fact to be undisputed for the purposes of the present motion.

27. At no time has Mr. Remington produced any F.R.C.P. Rule 26(f) expert witness reports in this case in compliance with said Rule of Court, despite repeated statements and requests by defendants' counsel to do so.

Plaintiff states that this asserted fact is "partially disputed," stating that he has produced substantial declarations and made his experts available for two lengthy depositions. Plaintiff argues that Defendants were therefore not prejudiced. The Court finds that the fact as stated is undisputed for the purposes of this motion.

**DISCUSSION**

*Timeliness of Pleadings*

Civil Local Rule 7–3 provides in part as follows:

(a) **Opposition.** Any opposition to a motion must be served and filed not more than 14 days after the motion is served and filed. The opposition may include a proposed order, affidavits or declarations, as well as a brief or memorandum under Civil L.R. 7–4. Any evidentiary and procedural objections to the motion must be contained within the brief or memorandum. Pursuant to Civil L.R. 7–4(b), such briefs or memoranda may not exceed 25 pages of text.

(c) **Reply.** Any reply to an opposition must be served and filed by the moving party not more than 7 days after the opposition is served and filed. The reply may include affidavits or declarations, as well as a supplemental brief or memorandum under Civil L.R. 7–4. Any evidentiary and procedural objections to the opposition must be contained within the reply brief of memorandum. Pursuant to Civil L.R. 7–4(b), the reply brief or memorandum my not exceed 15 pages of text.

Rule 5, Federal Rules of Civil Procedure, entitled, "Serving and Filing Pleadings and Other Papers," provides in part as follows:

(b) **Service: How Made.**

(2) **Service in General.** A paper is served under this rule by:

(C) mailing it to the person's last known address—in which event service is complete upon mailing.

Rule 6, Federal Rules of Civil Procedure, entitled, "Computing and Extending Time;

Time for Motion Papers," provides in part as follows:

**(d) Additional time After Certain Kinds of Service.**

When a party may or must act within a specified time after service and service is made under Rule 5(b)(2)(C), (D), (E), or (F), 3 days are added after the period would otherwise expire under Rule 6(a).

Defendants' Motion for Summary Judgment/Partial Summary Judgment was filed September 13, 2011. (Docket No. 63.) Under the authorities set forth above, Plaintiff's Opposition was therefore due to be filed and served no later than September 30, 2011. Plaintiff, however, admits that he served Defendants with his Opposition by placing a set of all documents in Counsel's dropbox "the evening of October 11, 2011." (Plaintiff's Objections, Docket No 88, 2:19.) Plaintiff filed his Opposition on October 17, 2011. (Docket No. 78.) Plaintiff did not obtain an extension of time to serve and file his Opposition pursuant to Civil Local Rule 6–3. Plaintiff therefore served his Opposition twelve days late and filed his Opposition seventeen days late.

 Defendants filed objections to Plaintiff's late filed Opposition. (Docket No. 77.) Defendants note correctly that the Court has discretion to disregard late filed papers. However, the Court finds that Plaintiff appears to have unknowingly relied on a superceded edition of the Civil Local Rules and that the interests of justice weigh in favor of considering his Opposition. *See Giordano v. Wachovia Mortg., FSB*, No. 5:10–cv–04551–JF, 2011 WL 1130523, at *1 (N.D.Cal.2011) (court exercised discretion to consider late-filed opposition when firm failed to calendar due date correctly). Accordingly, the Court overrules Defendants' objections to Plain-

tiff's Opposition on the ground of timeliness.

Defendants' Reply was filed October 24, 2011, thirteen days after Defendants were served with the Opposition. (Docket No. 81.) The Reply contains a certificate of service on Plaintiff by mail on October 24, 2011. The Reply was therefore both timely served and timely filed. *See* Civil Local Rule 5–5 (stating that in the case of service by mail, 3 days are added to the time in which any party must respond). The Court therefore finds Plaintiff's objections to Defendants' Reply based on timeliness to be meritless and overrules those objections. (Docket No. 88.)

*First Claim for Relief—Violation of the Clean Water Act*

 Plaintiff alleges that Defendants have violated and continue to violate the CWA through multiple discharges of pollutants from five different point sources without a permit from the National Pollution Discharge Elimination System ("NPDES"). Under the CWA, private citizens may sue any person alleged to be in violation of the conditions of an effluent standard or limitation under the Act or of an order issued with respect to such a standard or limitation by the Administrator of the Environmental Protection Agency (EPA) or any state. See 33 U.S.C. § 1365(a)(1). To establish a violation of the CWA, a plaintiff must prove that the defendant discharged a pollutant into navigable waters from a point source without a permit. *See National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 165 (D.C.Cir. 1982). In order to prevail at trial in an enforcement action under the CWA, the plaintiff must prove an "ongoing violation" by the defendant. 33 U.S.C. § 1251 *et seq.*; *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found. Inc.*, 484 U.S. 49, 64, 108 S.Ct. 376, 385, 98 L.Ed.2d 306 (1987). "[A] citizen plaintiff may prove ongoing

violations either (1) by proving violations that continue on or after the date the complaint is filed or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Sierra Club v. Union Oil Co.*, 853 F.2d 667, 671 (9th Cir.1988) (internal quotations omitted).

Defendants move for summary judgment on this claim, contending that Plaintiff has provided no evidence of any pollution discharge into any navigable waters from the Mathsons' property. Defendants contend that no "point source" of pollution exists, and that Plaintiff's allegations of toxins emanating from Defendants' French drain system are a complete fabrication. They claim that Plaintiff has never conducted any competent tests to establish the existence of any pollutant discharged into water by Defendants. Relying on the Ferriman and Gwinn Declarations, Defendants argue that the testing by their retained consultants shows that the water emanating from the 6″ drain pipes, cited in Plaintiff's CWA claim, contains absolutely no pollutants, much less the toxic contents alleged by Plaintiff.

Plaintiff alleges in his May 27, 2009 Notice of Intent to Sue that "Mathson's two 6″ drain pipes constitute 'point sources' under CWA." In opposing the present motion, Plaintiff claims that "we will prove the Mathsons discharged *multiple* pollutants in the past and the PRESENT into 'Remington Creek' ... from *multiple* point sources without any permit." Opposition, 5:4–5. For the purposes of the Clean Water Act, a point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 22 U.S.C. § 1362(14).

Plaintiff now states in his Opposition that the Mathsons' 6″ drain pipes "are NOT a 'point source' relevant to plaintiff's case." Opposition, 7:9–10. Plaintiff devotes considerable discussion to case law addressing whether groundwater can be a "point source" under the CWA. and alleges that "Mathson's polluted waters" flow directly into Remington Creek. Defendants argue that Plaintiff's alleged point sources in the form of alleged springs emanating from the ground do not constitute a point source as defined by federal law, and that even if they did, Plaintiff has not identified any such spring on Defendants' property.

After carefully reviewing Plaintiff's arguments, the Court finds that despite his extensive discussion of the general topic of point sources, Plaintiff has failed to identify any admissible evidence as to the existence of specific point sources on Defendants' property, as required to prevail on his CWA claim. The Court further finds that, as Defendants argue, Plaintiff has also failed to identify any admissible evidence that the groundwater in the area of the fill contains any of the pollutants necessary to prove a cause of action under the CWA or that Defendants have discharged or continue to discharge any pollutants into water. The burden is on Plaintiff to make those showings in order to support his CWA claim. Plaintiff having failed to meet his burden, the Court need go no further. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552. ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). The Court concludes that Defendants are entitled to judgment on this claim as a matter of law.

*Second and Third Claims for Relief—Violations of the Resource Conservation and Recovery Act*

■ In his second claim for relief, Plaintiff alleges that Defendants have violated the Resource Conservation and Recovery Act ("RCRA") by storing and mishandling large quantities of pollutants, contaminants and hazardous materials, which has caused the discharge of hazardous wastes to soil and groundwater. In his third claim for relief, Plaintiff alleges that Defendants have violated the RCRA by illegally operating a waste disposal and storage site, and by transporting hundred of tons of contaminants to their unpermitted site.

The RCRA provides in part as follows:

(a) In general

2. Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

(1)(A) against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or

(B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment;

Defendants move for summary judgment on this claim, contending that Plaintiff has provided no evidence of pollutants on or emanating from their property. They argue that the only items identified to date in the soil borings from the fill in their backyard are isolated fragments of hardened asphalt. These ·soil borings were taken by Blue Rock Environmental and were subjected to leachate and extraction tests to determine if any pollutants existed which were hazardous to human health and safety, or the environment. The leachate tested non-detect for gasoline, diesel and all other pollutants and metals tested for,· demonstrating, Defendants argue, that the asphalt was entirely inert. (Gwinn Dec. at ¶ 28; Ferriman Dec. at ¶ 8.) Defendants cite paragraph 12 of the Ferriman Declaration, which provides:

12. There are no levels of contaminants in soil or water samples from the fill collected by professionals or Remington that can be inferred as hazardous waste in the State of California, as defined by the CalEPA (lead agency in California), or under United States EPA regulations. In California (which is more restrictive than the federal standard), motor oil and diesel contaminated soil is defined as hazardous waste when levels are at or above 10,000 mg/kg and fail the fish bio-assay analysis. The term "hazardous" material is used throughout Mr. Remington's pleadings in this case merit.

In regard to Plaintiff's claims that chunks of cement pipe containing asbestos exist in the fill, Defendants assert that Plaintiff did not assert these claims until about one year ago. Citing the Gans Declaration at ¶ 8, Ex. R, Defendants state that in July of 2011, the Humboldt County

Department of Public Health commissioned an investigation and concluded that "[a]s of the last inspection on July 15, 2011, the debris observed appears to be stable, and does not pose any immediate threat to human health or the environment." Further, Defendants had Plaintiff's complaints about the cement pipe reviewed by Misha Schwartz of Winzler & Kelly, a certified asbestos investigator. In paragraph 7 of his Declaration, Mr. Schwartz opined that, "[t]he pipe fragments on the alleged fill near the property line are not in a 'friable, powdered or finely divided state' and thus are not hazardous waste in California." Mr. Schwartz further stated at paragraph 8:

> 8. As stated above, only several pieces of cement piping were observed, but it is unknown if one of these was the one sampled by Mr. Remington. In their current state the pipe fragments present no imminent threat to human health or safety, or the environment. Since the material is not friable, and assuming no further disturbance, release of airborne asbestos fibers from the cement piping would be very unlikely. Asbestos is mineral, does not "leach" and thus does not present a "contamination" hazard to soil or groundwater.

In conclusion, Defendant argue that Plaintiff first started accusing them of pollution in a letter written to them in 2006, and then waited over four years to do any environmental testing. (Gans Declaration, Ex. A.) They argue that Plaintiff has still not produced any environmental testing showing that hazardous materials as defined and regulated by the RCRA exist in the fill. Defendants conclude that without making a showing of the existence of con-

taminants on the property, Plaintiff cannot state a cause of action under the citizens suit provisions of RCRA.

In response, Plaintiff contends that Defendants have "established and maintained an illegal residential landfill and solid waste disposal facility by unlawfully disposing of and storing several million pounds of solid and hazardous waste on MY land (and his) which **MAY** (i.e. *possibly*) present and imminent and substantial endangerment to health or the environment." Opposition, 11:16–19. The evidence Plaintiff cites in support of his contention consists of lab tests taken by himself on his own property and the August 2011 water tests Remington took on portions of his own property. Specifically, Plaintiff argues that, "HIGH benzene and lead LISTED RCRA and CWA poisons are one concern, but everyone involved in the cases AGREES … that the high diesel values (W–2, W–3 and region of W–4), the motor oil values, gasoline (at W–2 in 2009 and since), the coliform, ecoli, … the carcinogenic asphalt dusts and friable asbestos (plus the HUGE number of mostly buried asbestos pipes) *also present a problem,* are objectionable and must be removed." Opposition, 14.[3]

The Court finds that the evidence cited by Plaintiff is inadmissible as without foundation and under the Court's order of September 27, 2012. Further, Plaintiff is not competent to present the opinions he expresses in this proceeding.

As Defendants argue in their Reply, despite having the burden of proof in this case, Plaintiff never tested any portion of Defendants' property. As discussed above, Defendants did conduct soil and

---

**3.** Plaintiff states in his Opposition that he is alleging four additional violations under RCRA. A Complaint cannot be amended through allegations made in an opposition to a motion to dismiss. *See generally* Rule 15, Federal Rules of Civil Procedure. Thus, the Court will disregard this assertion.

water tests on their property and no lead, benzene, gasoline or metals of any type were detected above background levels. (Gwinn Dec. at ¶¶ 23, 29.) Extraction tests reflected no diesel or motor oil substances which leach or migrate into water. (*Id.* at ¶¶ 19, 21 and 28.) The allegations Plaintiff now makes regarding cement pipe containing asbestos were not plead in the Complaint or added to it through amendment.

Based on the above, the Court finds that Plaintiff has failed to carry his burden of as the nonmoving party of establishing the elements of a claim under the RCRA. Plaintiff having failed to meet his burden, the Court need go no further. *See Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552. ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). The Court concludes that Defendants are entitled to judgment on this claim as a matter of law.

*Fourth Claim for Relief—Comprehensive Environmental Response Compensation and Liability Act*

 Plaintiff alleges a violation of § 103(a) of CERCLA, claiming that Defendants have discharged high concentrations of several CERCLA and 40 CFR § 302.4 listed hazardous chemicals onto his property, which inferentially exist in equal or greater concentrations beneath their own property. CERLA was designed to promote the "timely cleanup of hazardous waste sites" and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination. *Consolidated Edison Co. of N.Y. v. UGI Utilities, Inc.,* 423 F.3d 90, 94 (2nd Cir.2005).

Defendants move for summary judgment on this claim, contending that the placement of fill materials, authorized under a Site Disposal Agreement with the County of Humboldt 13 years ago, does not constitute a release of "hazardous substances" by Defendants. Defendants claim that Plaintiff never competently tested for the numerous toxins and heavy metals he lists in his Complaint, and that Blue Rock's testing revealed that none of the exist in the soil. Defendants rely in part on paragraph 30 of the Gwinn Declaration, wherein he states, "[b]ased on the results of this investigation, Blue Rock sees no basis or support for Mr. Remington's claims, and no corrective action related to the fill material is warranted under any state or federal laws governing any of the pollutants Mr. Remington claims to exist in this case." Defendants emphasize in their claim that Plaintiff never tested any portion of the land or water on their property prior to or after filing his Complaint in this case.

Plaintiff responds with a lengthy discussion of the elements of a CERCLA claim, and a bald assertion that Defendants have deposited "7–10 KNOWN 'hazardous substances' on plaintiff's land, which can and will be proven in Court to be hazardous." In so arguing, Plaintiff ignores his burden in the present motion for summary judgment, set forth at length above.

After reviewing the parties' arguments, the Court finds that Plaintiff has failed to introduce any admissible evidence to establish a genuine issue of material fact regarding his CERCLA claim. The Court concludes that Defendants are entitled to judgment as a matter of law on this claim.

*Fifth Claim for Relief—Emergency Planning and Community Right to Know Act*

 Plaintiff alleges a violation of § 304 of the EPCRA, 42 U.S.C. § 116, for failure to report a release of hazardous substances. The EPCRA imposes "a system of notification requirements on industrial and commercial facilities and mandate[s] that state emergency response commis-

sions and local emergency planning committees be created." *Huls America Inc. v. Browner,* 83 F.3d 445, 446 (D.C.Cir.1996). Under the EPCRA § 304, facilities that produce, use or store hazardous chemicals must immediately report accidental releases of "extremely hazardous substances" and chemicals in quantities greater than corresponding Reportable Quantities (RQs) defined under CERCLA to state and local officials. *See* 42 U.S.C. § 11004(a)(1).

Defendants move for summary judgment on this claim, contending that their backyard is not a "facility" covered by the provisions of the EPCRA, that there was no "release" of "extremely hazardous substances" in amounts greater than the applicable "reportable quantities" by Defendants, and no "emergency report" was required from Defendants. They further contend that they were not required to submit a follow up emergency notice under 42 U.S.C. § 11004(c). Finally, Defendants contend that Plaintiff's claim brought some 13 years after the backyard landscaping project took place is time-barred under the general "catch-all" five-year statute of limitations period contained in 28 U.S.C. § 2462.

Plaintiff contends in response that the Mathsons' backyard is a "landfill" and as such is regulated by the EPCRA. After reviewing Plaintiffs' arguments, the Court finds that Plaintiff has failed to produce any evidence to establish a genuine issue as to whether the backyard is a commercial facility of the nature regulated by the requirements applicable to commercial landfill facilities under the EPCRA. Plaintiff has provided no competent, admissible evidence that any pollutant exists on the Mathsons' property, and thus has not shown that any release of substances governed by EPCRA § 304 has occurred. Plaintiff having failed to meet his burden of making that showing, Defendants are entitled to judgment as a matter of law on this claim. *See Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552.

## CONCLUSION

Based on the foregoing and the Court's exhaustive review of the parties' extensive papers filed in connection with the motion, the Court finds that the record taken as a whole could not lead a rational trier of fact to find for Plaintiff in this case. Plaintiff's opposition is not fact-based, and simple gainsaying is insufficient to carry Plaintiff's burden of proof in opposition to this motion for summary judgment. There is no genuine issue for trial remaining and Defendants are entitled to judgment as a matter of law on Plaintiff's federal claims. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

Accordingly, IT IS HEREBY ORDERED as follows:

1) Defendants' Request for Judicial Notice filed September 13, 2011, is GRANTED (Docket No. 68);

1) Defendants' Motion for Summary Judgment/Partial Summary Judgment is GRANTED and Defendants are granted summary judgment on Plaintiff's first, second, third, fourth, and fifth claims for relief;

2) The Court declines to retain jurisdiction over Plaintiff's state law claims and therefore DISMISSES Plaintiff's sixth, seventh, and eighth claims for relief without prejudice to the litigation of these claims in State Court;

3) The Clerk of the Court is directed to enter judgment for Defendants and to close this case.